Dolores M. AGLIORI, Executrix of the
Estate of James J. Donahue,
Appellant

v.

METROPOLITAN LIFE INSURANCE
COMPANY and George R. Weber,
Appellees

Superior Court of Pennsylvania.

Argued April 20, 2005.

Filed July 8, 2005.

Kenneth R. Behrend, Pittsburgh, for appellant.

Marshall J. Tindall, Pittsburgh, for Weber.

Penelope M. Taylor, Newark, New Jersey, for Metropolitan Life.

Before: ORIE MELVIN, BENDER and BECK, JJ.

OPINION BY BECK, J.:

¶ 1 This case presents two issues under the Unfair Trade Practices and Consumer Protection Law.[1] First, has a consumer who entered a contract based on misrepresentation suffered an ascertainable loss within the meaning of the statute? Second, does the statute support an award of attorneys' fees for litigation that was initiated prior to the effective date of an amendment that explicitly allowed such relief? We reverse in part and affirm in part.

¶ 2 In April 1990, appellant-plaintiff's decedent James Donahue surrendered three whole life insurance policies to purchase a single universal life policy from appellee-defendant Metropolitan Life Insurance Company (MetLife) through its employee, appellee-defendant George Weber. Two of the surrendered policies (acquired in 1941 and 1954) were paid in full and thus required no additional premiums. Mr. Donahue and his wife, Dolores Donahue, were paying approximately $600 per year on the third policy. Dividends from the policies had been automatically applied to purchase additional death benefit coverage, per the Donahues' wishes, and thus the policies were slowly increasing in value. At the time of surrender, the total cash surrender value of the three policies was $13,608 and the face value death benefit was $15,181; however, appellant's evidence suggested that the actual death benefit provided by the three policies at this time was approximately $26,000.[2] By terms of the newly pur-

---

1. 73 P.S. §§ 201-1-209-6.

2. The cash surrender values of the three policies were the following: policy number one, acquired in 1941, $1,913; policy number two, acquired in 1954, $7,668; policy number three, acquired in 1975, $4,027, for a total of $13,608. Appellant's evidence suggested that the policies had the following death benefit coverage at the time they were surrendered: policy number one, $2,289; policy number two, $8,949; policy number three, $15,157, for a total death benefit of $26,393 [sic].

chased universal life policy, Mr. Donahue's estate would receive a death benefit of $50,000 in the first year and $40,000 thereafter, in exchange for the cash surrender value of the existing policies plus an annual premium payment. Mr. Donahue believed that the annual cost of this additional coverage would remain similar to what he was paying at the time, *i.e.* $600 per year, and that the new policy would be similar to his whole life policies, just with a higher death benefit. At the time of this transaction, Mr. Donahue was seventy-three years old, married, and responsible for the care of his mentally disabled adult son.

¶ 3 Mr. Donahue became concerned about the terms of his universal life insurance policy when he learned through the news media of numerous allegations of improper sales practices by MetLife and its agents in Allegheny County. In 1995, after he learned that some of the features of his universal life policy were not as he had thought, he initiated an action against MetLife and Mr. Weber. He filed an amended complaint in 1999. His complaint alleged, among other causes of action, unfair and deceptive trade practices, pursuant to the Unfair Trade Practices and Consumer Protection Law (UTPCPL). 73 P.S. §§ 201–1—209–6. Mr. Donahue's broad allegation was that Mr. Weber and Met-Life had engaged in "churning," or replacement of his existing policies with a new one, leading to higher commissions and administrative fees, without full notification of the negative aspects of such transactions. More specifically, Mr. Donahue claimed that because of misrepresentations by Mr. Weber, he was not aware that the universal life policy had a termination date, was likely to require annual premiums greater than $600, and did not gradually increase in value like his surrendered whole life policies. On February 17, 2002, more than two years before trial, Mr. Donahue died.[3]

¶ 4 After a bench trial on April 8, 2004, the trial court determined that Mr. Donahue had purchased the universal life insurance policy as a result of unfair or deceptive practices, employed by Mr. Weber, that were unlawful under section 3 of the Unfair Trade Practices and Consumer Protection Law.[4] The court found that Mr. Weber had contacted Mr. Donahue concerning the purchase of increased life insurance coverage and then had given him information that was not true. Specifically, unknown to Mr. Donahue, the universal life policy that he purchased had a termination date. The coverage terminated on the first policy anniversary after Mr. Donahue turned 95. In addition, there was no guarantee that payments of $600 annually would maintain the policy until that termination date. In fact, it was very likely that much higher premiums would be required to maintain the policy. Unknown to Mr. Donahue, the actual premiums were apparently always substantially greater than the $600 that the Donahues paid annually, but their payments were supplemented by gradual depletion of the cash value of the surrendered policies. In making the above factual findings, the trial court explicitly noted that it found the testimonies of Mr. Donahue and his family accurate,

---

3. Dolores Agliori, Mr. Donahue's daughter and executrix of his estate, stepped into the plaintiff's role upon her father's death. Mr. Donahue's testimony, as provided through his deposition on April 9, 1998 was admitted into evidence at trial.

4. The unfair or deceptive acts or practices covered by the statute are defined in 73 Pa. C.S.A. § 201–2(4), and they are declared unlawful in § 201–3. The trial court's Opinion does not specify which provisions of § 201–2(4) it relied on in finding Mr. Weber's practices unlawful.

and did not find credible the testimony of Mr. Weber.

¶ 5 Although the court found that Mr. Donahue had relied on Mr. Weber's unlawful practices in deciding to surrender his whole life policies and purchase a universal life policy, the court dismissed the claims and declined to award damages because it did not find that Mr. Donahue had suffered any ascertainable loss of money or property. The court determined that Mr. Donahue had entered into the transaction to purchase $40,000 of life insurance coverage for $600 per year plus the surrender value of his whole life policies. Because Mr. Donahue never paid more than $600 per year for the insurance and his estate received $40,000 plus interest upon his death, the court found that Mr. Donahue received the policy that he wished to purchase and therefore did not suffer any loss.

¶ 6 Appellant-plaintiff contends that Mr. Donahue did suffer an ascertainable loss as a result of his reliance on the unlawful practices employed by appellee-defendants. To ascertain the loss suffered by Mr. Donahue, appellant calculates the projected value of the three surrendered whole life policies had they still been in existence at the time of Mr. Donahue's death. Evidence presented by appellant suggests that the value of those policies when Mr. Donahue died would have been approximately $47,000, which is greater than the approximately $40,000 death benefit that was paid to Mr. Donahue's estate. Appellant seeks damages corresponding to this difference, *i.e.* between the death benefit that was paid and what it would have been had the three surrendered policies

remained in effect.[5] Appellant also seeks treble damages and attorneys' fees.

¶ 7 Our standard in reviewing a court order pursuant to a bench trial is strict: we reverse only if the decision is based on an error of law or on factual findings that are unsupported by evidence of record. *Stokes v. Gary Barbera Enterprises, Inc.*, 783 A.2d 296, 297 (Pa.Super.2001), *appeal denied*, 568 Pa. 723, 797 A.2d 915 (2002); *Wallace v. Pastore*, 742 A.2d 1090, 1092 (Pa.Super.1999), *appeal denied*, 564 Pa. 713, 764 A.2d 1071 (2000).

¶ 8 The purpose of the Unfair Trade Practices and Consumer Protection Law (UTPCPL) is to protect the public from—and indeed to eradicate—"unfair or deceptive business practices." *Commonwealth v. Monumental Properties*, 459 Pa. 450, 457–61, 329 A.2d 812, 815–17 (1974). "[T]he statute's underlying foundation is fraud prevention," and its strategy is to place the consumer and the seller of goods and services on more equal terms. *Id.* at 458–59, 329 A.2d at 816. To effect the remedial goals of the statute, courts should construe its provisions liberally. *Id.* at 459–60, 329 A.2d at 816–17; *Wallace*, 742 A.2d at 1093. *See also Pirozzi v. Penske Olds–Cadillac–GMC, Inc.*, 413 Pa.Super. 308, 605 A.2d 373, 375–77 (1992) (citing *Monumental Properties, supra*).

¶ 9 The UTPCPL declares that a number of "unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. 73 P.S. § 201–3. The unfair or deceptive acts or practices declared unlawful include the following:

(ii) Causing likelihood of confusion or of misunderstanding as to the source, spon-

---

**5.** Appellant alternatively suggests calculation of Mr. Donahue's ascertainable loss in another way: combining the cash surrender value of the three surrendered policies plus the total additional premiums paid by the Donahues for the universal life policy and then adding

interest accrued. Under the facts and circumstances of this case, we find little merit to this method of calculating loss. *See* text, *infra* for our discussion of appellant's first method of calculating his ascertainable loss, which we favor.

sorship, approval or certification of goods or services;

(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

(vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

(xv) Knowingly misrepresenting that services, replacements or repairs are needed if they are not needed;

(xvii) Engaging in any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding.

73 P.S. § 201–2(4) (1993).[6]

¶ 10 The statute expressly provides for private actions against one who has allegedly engaged in a deceptive act or practice, as defined in section 2. Such private action may be brought to recover damages for an ascertainable loss, including up to treble damages.

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action, to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100),

and may provide such additional relief as it deems necessary or proper.

73 P.S. § 201–9.2(a) (1993).

¶ 11 The UTPCPL does not provide a formula for calculation of "actual damages", and, as noted recently by the Third Circuit Court, the Pennsylvania Supreme Court has not to date interpreted this statutory term. *Samuel–Bassett v. KIA Motors America, Inc.*, 357 F.3d 392, 399 (3d Cir.2004); *Young v. Dart*, 428 Pa.Super. 43, 630 A.2d 22, 26 (1993). Case law does, however, make clear that the UTPCPL was meant to supplement—not to replace—common law remedies. *Wallace*, 742 A.2d at 1093 (citing *Gabriel v. O'Hara*, 368 Pa.Super. 383, 534 A.2d 488, 491 (1987)). In addition, as previously noted by this Court, the statute's prohibited acts and practices are not divided into "tort-like" versus "contract-like" violations; rather, all prohibited acts and practices are listed together in section 2(4). *Johnson v. Hyundai Motor America*, 698 A.2d 631, 639 (Pa.Super.1997), *appeal denied*, 551 Pa. 704, 712 A.2d 286 (1998). Consistent with the melding of statutory and common law tort and contract remedies, our case law has sanctioned the application of several damage assessment schemes under the UTPCPL.

¶ 12 Two previous cases have fashioned different remedies when the issue was fraudulent misrepresentation in the sale of real property. In *Metz v. Quaker Highlands, Inc.*, 714 A.2d 447 (Pa.Super.1998), a prevailing plaintiff was awarded rescission of a sales contract for real property as well as treble damages under the UTPCPL. The defendant-seller had fraudulently concealed the fact that the property consisted of deep backfill, making it unfit for the use that the plaintiff-buyers

---

**6.** The statute was amended in 1996 to add some additional acts on practices, and Sec-

tion xvii was renumbered at that time.

intended. The seller intentionally misled the buyers into the purchase of the property, knowing that it was unfit for their intended use. Given the outrageous conduct of the seller and the goal of the UTPCPL to deter such behavior, this Court held that rescission alone was an insufficient remedy and that a penalty for fraudulent behavior was appropriate. *Id.* at 450. A similar problem led to a different remedy in *Skurnowicz v. Lucci,* 798 A.2d 788 (Pa.Super.2002). In this case, the trial court found fraudulent misrepresentation and a violation of the UTPCPL by sellers of real property who misrepresented the flooding problems on the land. The aggrieved party elected not to rescind the contract of sale, but sought to recover damages. The trial court held, and his Court affirmed, that the proper measure of damages was the difference between the property's actual value and the misrepresented value. *Id.* at 795.

¶ 13 In two other cases under the UTPCPL, this Court has considered remedies in the context of the sale of a vehicle based on misrepresentations. In *Young,* 630 A.2d at 26–28, the issue was the level of damages appropriately awarded under the UTPCPL to a plaintiff who purchased a damaged and reconditioned car based on the misrepresentation that it was a new vehicle. The trial court assessed actual damages as the cost of the car (minus the value that plaintiff had received from use of it), plus incidental and consequential damages. This Court affirmed, finding that the dispute involved a breach of contract, where the appropriate level of damages should place the aggrieved party in the position he would have occupied in the absence of the breach. *Id.* at 27. A similar result was reached in *Stokes,* 783 A.2d at 298, another case in which a used vehicle was misrepresented and sold as a new vehicle. However, the *Stokes* court ordered, and this Court affirmed, punitive damages in the amount of twice the actual damage award. *Id.* at 299.

¶ 14 The crux of the issue in the present case is whether Mr. Donahue suffered an "ascertainable loss" within the meaning of the UTPCPL, section 201–9.2 and was therefore entitled to damages. The trial court held that Mr. Donahue did not suffer an ascertainable loss because his estate received the benefits of the universal life policy on the terms that he transacted in 1990. Specifically, he thought he was buying life insurance that would provide a $40,000 benefit upon his death, for a cost of $600 annually plus the cash surrender value of his three existing whole life policies. This is in fact exactly what he obtained. Therefore, the trial court held that Mr. Donahue suffered no harm from Mr. Weber's fraudulent conduct and was not entitled to any legal remedy.

¶ 15 While we understand the trial court's logic, we cannot agree with its conclusion. The trial court's resolution comports neither with the directive from our Supreme Court to construe the UTPCPL's provisions liberally, nor with the purpose of the statute to prevent and deter fraud. *Monumental Properties,* 459 Pa. at 458–61, 329 A.2d at 816–17; *Metz,* 714 A.2d at 450. The transaction that Mr. Donahue entered was based on fraud and false information. The trial court found that agent Weber contacted Mr. Donahue about increasing his life insurance coverage and then gave him false information, with the result that Mr. Donahue cancelled his existing policies and purchased a new one. The trial court determined that Mr. Donahue relied on Mr. Weber's misrepresentations in making his decision to change his life insurance coverage. Mr. Donahue did not knowingly balance the positive and negative aspects of the proposed new policy with his existing life insurance coverage

because of the misrepresentations made by Mr. Weber. Under such circumstances, an assessment of ascertainable loss, as required by section 9.2(a) of the statute, can not be made by examining only the terms of the new policy. It is not sufficient to ask only if Mr. Donahue received what he sought in the transaction, because the whole transaction was based on misrepresentation—and therefore he did not know the true cost to him and what he was potentially losing upon entry into the transaction proposed by Mr. Weber.

¶ 16 Because the transaction misrepresented by Mr. Weber involved not just the purchase of a universal life policy, but also the surrender of three whole life policies, it is necessary to examine the terms of *all* the policies that constituted the transaction. Specifically, to determine if Mr. Donahue has suffered an ascertainable loss, the court must make the following factual determinations: compare the death benefit that his estate actually received (from the universal life policy) with the benefit that his estate would have received had he never entered the transaction in question, but instead just maintained his three whole life policies. Appellant's evidence suggests that the estate would have received a greater benefit if Mr. Donahue had never entered the transaction. The court acknowledges that it might have considered this evidence, had it found that the estate was entitled to actual damages. But it is not only for an award of actual damages that such evidence must be considered. Rather, the evidence is also highly relevant to a determination of whether Mr. Donahue suffered an ascertainable loss attributable to Mr. Weber's misrepresentations.

¶ 17 We are aware that the difference in death benefit provided by Mr. Donahue's universal life policy compared to the benefit that would have been provid-

ed by his three surrendered whole life policies is a function of when he died. As pointed out by the trial court, for many years after Mr. Donahue's purchase of the universal life policy, the $40,000 death benefit provided by that policy exceeded the death benefit that would have been provided by his three surrendered whole life policies. However, since Mr. Donahue lived for approximately twelve years after purchasing the universal life policy, the evidence presented suggests that the death benefit provided by his surrendered policies would have exceeded $40,000 by that time. This is because the surrendered policies steadily increased in value due to reinvestment of the dividends toward the purchase of additional coverage. Had Mr. Donahue died earlier, when the $40,000 death benefit from his universal life policy was greater than what the benefit would have been under his three surrendered policies, we would be more inclined to agree with the trial court that his estate had suffered no ascertainable loss, as required to prevail under the UTPCPL. However, this is not what occurred. Ascertainable loss must be established from the factual circumstances surrounding each case, and in Mr. Donahue's case the evidence presented indicates that his estate suffered an ascertainable loss due to misrepresentations by Mr. Weber that induced Mr. Donahue to change his life insurance policy.

¶ 18 We believe that our decision in this case is supported—if not mandated—by the purpose of the UTPCPL. Decisions by our Supreme Court and this Court have stressed time and again the deterrence function of the statute. *See Weinberg v. Sun Co., Inc.,* 565 Pa. 612, 618, 777 A.2d 442, 446 (2001); *Monumental Properties,* 459 Pa. at 458–61, 329 A.2d at 816–17; *Toy v. Metropolitan Life Ins. Co.,* 863 A.2d 1, 10 (Pa.Super.2004); *Metz,* 714 A.2d at 450

(stating that the intent and purpose of the UTPCPL are "to curb and discourage ... future [fraudulent] behavior [in consumer-type cases]"); *Johnson,* 698 A.2d at 638–39. If the court permits the appellee-defendants simply to repay what is owed the consumer under the fraudulently induced contract, the deterrence value of the statute is weakened, if not lost entirely. We can not accept such an evisceration of the statutory goals.

¶ 19 We therefore remand to the trial court for determination of Mr. Donahue's ascertainable loss and the appropriate damages. Appellants seek treble damages, but we decline to rule on that issue. The imposition of treble damages is within the discretion of the trial court, to be determined on remand. *See Johnson,* 698 A.2d at 639.

■ ¶ 20 The final issue raised by appellants concerns attorneys' fees. Appellants seek attorneys' fees from the inception of the action in 1995. Appellants rely on the following statutory language, which was in effect at the inception of this action: "The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), *and may provide such additional relief as it deems necessary or proper.*" 73 P.S. § 201–9.2 (1978) (emphasis added). Appellants argue that this language should be interpreted broadly enough to allow relief in the form of attorneys' fees to prevailing plaintiffs.

¶ 21 The trial court held that this language was not sufficient to support an award of attorneys' fees and thus refused to allow such an award under the statute that was in effect when the suit was initiated. However, based on an amendment to the UTPCPL, which became effective on February 2, 1997, the trial court also held that attorneys' fees *could* be awarded under the statute for legal work done after

this date. In relevant part, the 1997 amendment expressly provided that "[t]he court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees." 73 P.S. § 201–9.2 (1997). Based on this addition to the UTPCPL, the trial court determined that an award of attorneys' fees was permitted under the statute *after* the effective date of the amendment even for litigation that had been initiated prior to the amendment's effective date. Appellants argue only that attorneys' fees should be permitted for legal work done before, as well as after, the effective date of the amendment.

¶ 22 The question presented to us is one of statutory interpretation, a question of law, and thus our standard of review is *de novo* and our scope is plenary. *In re Hickson,* 573 Pa. 127, 134, 821 A.2d 1238, 1242 (2003). We agree with the trial court's interpretation of the statute and relevant case law, and thus affirm.

¶ 23 Our Supreme Court directly addressed the question of statutory language as applied to attorneys' fees in *Merlino v. Delaware County,* 556 Pa. 422, 728 A.2d 949 (1999). The plaintiff-appellees in *Merlino* had initiated a citizens' suit under the Storm Water Management Act. After prevailing in their suit, they sought to recover attorneys' fees from the county under a provision of the Act which provided that "[t]he expense of such proceedings shall be recoverable from the violator in such manner as may now or hereafter be provided by law." *Id.* at 424, 728 A.2d at 950 (quoting 32 P.S. § 680.15(b)). The Commonwealth Court awarded attorneys' fees to plaintiff-appellees, finding that the statutory meaning of "expense" included attorneys' fees. However, Our Supreme Court reversed, holding that recovery of attorneys' fees is possible only if the relevant statutory provision explicitly allows recov-

ery of this particular expense. *Id.* at 425–26, 728 A.2d at 951. The court noted that it "has consistently followed the general, American rule that there can be no recovery of attorneys' fees from an adverse party, absent an express statutory authorization, a clear agreement by the parties or some other established exception." *Id.* at 425, 728 A.2d at 951.

¶ 24 The rule in *Merlino* was applied by this Court in *Sheriff v. Sheriff,* 802 A.2d 644 (Pa.Super.2002). The prevailing party in *Sheriff* sought attorneys' fees under the authority of a provision of Pennsylvania Rule of Civil Procedure 1920.43(a)(3), which permits the court to "grant other appropriate relief." A panel of this Court held that such broad language did not allow the award of attorneys' fees, since it did not explicitly authorize them. *Id.* at 646–47.

¶ 25 *Merlino* also controls the present case. The statutory language in effect when the present suit was initiated did not explicitly provide for an award of attorneys' fees. The language on which appellants rely to support their petition for attorneys' fees permits the court to "provide such additional relief as it deems necessary or proper." 73 P.S. § 201–9.2 (1978). This language is similar to the language at issue in *Sheriff,* which this Court held would not support an award of attorneys' fees. 802 A.2d at 646–47. Thus, under *Merlino* and *Sheriff,* the language on which appellants rely cannot support an award of attorneys' fees. We therefore affirm the trial court's order denying an award of attorneys' fees for legal work done prior to February 2, 1997, the effective date of the UTPCPL amendment that specifically allowed such fees.

¶ 26 Affirmed in part, and reversed and remanded in part for proceedings consistent with this Opinion. Jurisdiction relinquished.