Edmond J. LESOON and Kathy
Lesoon, His Wife,
Appellants,

v.

METROPOLITAN LIFE INSURANCE
COMPANY and Affiliated Companies
and Ronald Sabilla, Appellees,

v.

Edmond J. Lesoon and Kathy
Lesoon, Appellants,

v.

Metropolitan Life Insurance Company
and J. Joel Sherman, Appellees.

Edmond J. Lesoon and Kathy Lesoon,
His Wife, Appellees,

v.

Metropolitan Life Insurance Company
and Ronald Sabilla, Appellants.

Edmond J. Lesoon and Kathy Lesoon,
His Wife, Appellees,

v.

Metropolitan Life Insurance Company
and J. Joel Sherman, Appeal of: Met-
ropolitan Life Insurance Company,
Appellant.

Superior Court of Pennsylvania.

Filed March 28, 2006.
Reargument Denied June 9, 2006.

Kenneth R. Behrend, Pittsburgh, for Lesoon.

B. John Pendleton, Newark, NJ, Metropolitan Life.

BEFORE: MUSMANNO, TODD and BOWES, JJ.

OPINION BY BOWES, J.:

¶ 1 Edmond and Kathy Lesoon appeal from the judgment entered on the nonjury verdict after the trial court found that they did not sustain actual damages as a result of the deceptive sales practices of Metropolitan Life Insurance Company ("MetLife"). MetLife has filed a cross-appeal challenging the trial court's award of nominal damages and the court's determination that the action was not time-barred. Upon review, we vacate the judgment and remand for further proceedings consistent with this opinion.[1]

¶ 2 The record reveals that Mr. Lesoon purchased two life insurance policies from MetLife during the 1970s. In 1975, he bought a $5,000 family policy payable at age sixty-five under which he was insured for $3,000, his wife was insured for $2,000, and their daughter was insured for $1,000. In 1976, Mr. Lesoon bought a $10,000

---

1. Prior to trial, the parties agreed to dismiss defendants Ronald Sabilla and J. Joel Sherman from the case.

whole life policy under which he was the sole insured. The total monthly payment for both policies amounted to $32.50. Appellants made regular, timely payments using payment coupons and checks drawn on Mrs. Lesoon's personal checking account.

¶ 3 On January 8, 1989, MetLife agent Ronald Sabilla traveled to Appellants' home in McKees Rocks, Pennsylvania, and advised Mr. Lesoon that he could increase his coverage from $15,000 to $65,000 by purchasing a $50,000 universal life policy ("universal policy") at an additional cost of $18.00 per month. According to Mr. Lesoon, Mr. Sabilla promoted the universal policy as a retirement plan. Mr. Sabilla informed Mr. Lesoon that if he bought the universal policy, the $5,000 and $10,000 policies would remain in force, and if Mr. Lesoon ever failed to make a monthly payment on the universal policy, MetLife would simply "take part of the dividends out of the ... $5,000 [family policy]." N.T. Trial, 4/14/03, at 19. Mr. Lesoon responded that he did not want to use dividends from the family policy to pay for the universal policy and that he could not afford to purchase any additional insurance because he and his wife had a combined yearly income of less than $25,000. However, when Mr. Lesoon subsequently discussed the matter with his wife, they decided to eliminate certain luxury expenses and buy the universal policy. Thus, Mr. Lesoon submitted an application, and Mrs. Lesoon gave Mr. Sabilla a check for $60. Mr. Sabilla indicated that the $60 payment would guarantee coverage if something should happen to Mr. Lesoon while his application was being approved.

¶ 4 The application was approved, and Mr. Sabilla returned to Appellants' home on March 7, 1989. Mr. Sabilla promptly reimbursed Appellants for the $60 check they had provided in January, and Mr. Lesoon proceeded to sign contractual documents pertaining to the universal policy. Prior to signing, however, Mr. Lesoon unequivocally refused to utilize the Metropolitan Check-O-Matic Plan, a payment program that would have enabled MetLife to automatically withdraw monthly premiums from a checking account. Mr. Lesoon insisted on paying for the universal policy using payment coupons and checks. Based on Mr. Sabilla's representations, Mr. Lesoon believed that he was purchasing a new policy worth $50,000, that the existing family and whole life policies would not be altered in any way, and that the total monthly payment for all three policies would never exceed $50.50.

¶ 5 Appellants later discovered that Mr. Sabilla misrepresented the terms of the universal policy and that they had been enrolled in the Check-O-Matic Plan without their consent. The trial court summarized its factual findings:

> Mr. Sabilla knew—but did not advise [Appellants]—that the $50.50 monthly payment would be sufficient only if the transaction included the restructuring of the $5,000 [family] policy from a policy payable at age 65 to a policy payable at age 85 and the transfer of the accumulated funds in the $5,000 policy to the $50,000 policy.
>
> . . . .
>
> The paperwork that Metropolitan Life prepared [for the universal policy] provided for the $5,000 policy to be converted from age 65 to age 85 and for the accumulated funds in the $5,000 policy to be transferred to the universal life policy.
>
> ... [Appellants] had always paid the life insurance premiums through a monthly payment, using a coupon book and checks. They made it clear to Mr. Sabilla that this was the way they would

pay for the $50,000 universal life policy. Mr. Sabilla recommended that they use the Metropolitan Life Check–O–Matic Plan under which premiums are automatically withdrawn from a checking account. [Appellants] told him that this was not acceptable.

Under Metropolitan Life procedures (which were unknown to [Appellants]), an insured could make monthly payments on a universal policy only by using the Check–O–Matic Plan. Someone at Metropolitan Life forged Ms. Lesoon's signature on a form authorizing monthly withdrawals from her checking account. In reliance on the authorization, Ms. Lesoon's bank made withdrawals of $61.75 in March, April, and May [1989]. [Appellants] had not reviewed the monthly statements from the bank and were not aware that this was occurring until two checks bounced in June.

Once [Appellants] learned that these monthly withdrawals were occurring without their permission, they objected to Metropolitan Life. Through a check dated June 14, 1989, in the amount of $185.25, Metropolitan Life returned the money to Ms. Lesoon.

Once [Appellants] learned of the unauthorized withdrawals, they had a series of meetings with Metropolitan Life representatives to discuss the transaction and the forged authorization. Through these meetings, they learned that their $5,000 age 65 [family] policy had been replaced with a $5,000 age 85 policy. They also learned that the $50.50 monthly payment would not pay for the three policies unless money in the $5,000 policy was transferred to the $50,000 policy. In December 1989, they asked that everything be restored to where it was before they purchased the $50,000 policy. In June 1990, Metropolitan Life returned [Appellants] to the position that they would have occupied if they

had not purchased the $50,000 policy: the universal policy was cancelled and all money in that policy was refunded. While Metropolitan Life issued a new $5,000 policy, it had the same monthly premium of $16.10, the same terms as the initial policy, and the same amount of money in the new policy as would have been in the old policy if it had not been altered . . . .

Trial Court Memorandum and Verdict, 5/9/03, at 2–4 (footnotes and citations to record omitted).

¶ 6 Appellants filed a praecipe for writ of summons at docket number GD 91–7121 on April 24, 1991, naming MetLife and Mr. Sabilla as defendants. On March 5, 1993, Appellants filed a complaint alleging breach of contract, fraud, and violation of the Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201–1—209–6 ("UTPCPL"). The matter proceeded to arbitration on March 16, 1994, resulting in an award for the defendants. Appellants filed a timely appeal and demanded a jury trial.

¶ 7 Thereafter, on April 21, 1995, Appellants instituted a second action against MetLife and agent J. Joel Sherman at docket number GD 95–6841 based on deposition testimony that Mr. Sabilla was acting on behalf of MetLife and Mr. Sherman when he sold Appellants the universal policy. The 1995 complaint alleged violations of the UTPCPL and breach of contract. The two actions were consolidated at GD 91–7121 on May 11, 1995.

¶ 8 The case was listed for trial in May 1996. Immediately following jury selection, MetLife submitted a motion for summary judgment, which the trial judge granted. On appeal, this Court vacated the judgment and remanded for trial, stating that the summary judgment motion was an inappropriate attempt to delay tri-

al. *See Lesoon v. Metropolitan Life Ins. Co.,* 700 A.2d 1034 (Pa.Super.1997) (unpublished memorandum). Based on that memorandum decision, which was filed on June 23, 1997, Appellants instituted another lawsuit on August 27, 1997, against MetLife and its attorney, Frederick N. Egler, Jr., seeking damages for abuse of process.

¶ 9 In the interim, MetLife and Appellants entered into settlement negotiations in the case relating to Appellants' purchase of the universal policy. At a pretrial conference on February 23, 1998, the presiding judge encouraged the parties to settle the dispute that day. Appellants initially agreed to dismiss all claims against MetLife arising out of the transaction in exchange for a paid-in-full $50,000 policy and $20,000 in cash. However, when MetLife requested that Appellants abandon their abuse-of-process suit against MetLife and Attorney Egler, Appellants refused, and the proposed settlement collapsed.[2] Appellants then filed a "motion to enforce settlement agreement" seeking to obtain the $50,000 policy and the $20,000 cash payment. That motion was denied by order dated April 16, 1998, an appeal of that order was quashed as interlocutory by this Court in a *per curiam* order, and our Supreme Court denied review. *Lesoon v. Metropolitan Life Ins. Co.,* 559 Pa. 692, 739 A.2d 1058 (1999).

¶ 10 The case proceeded to a nonjury trial where the judge heard testimony from Appellants, Mr. Sabilla, Mr. Sherman, and two other MetLife employees,

Crosby Engel, a retired auditor, and Edward Rakowski, a member of the consumer relations department.[3] The judge found in favor of Appellants on their UTPCPL and fraud claims, awarded $100 in damages, and denied their request for attorneys' fees and costs.[4] The judge reasoned that while the forgery which enabled MetLife to withdraw funds from Mrs. Lesoon's checking account without authorization constituted a fraudulent and deceptive act, Appellants did not suffer actual damages as a result of the incident. The court stated as follows:

I find considerable merit to the position of Metropolitan Life that [Appellants] did not suffer any actual damages from the loss of their property. This money was in a checking account that did not pay interest. The bank waived its fees for the checks that bounced. The money was restored to [Mrs. Lesoon's] checking account approximately two weeks after [Appellants] objected to the withdrawals.

However, I will assume that the following damage claim may be raised: The law does not permit a person to benefit from a fraudulent act. In this case, as a result of its fraudulent misconduct, Metropolitan Life had the use of [Appellants'] money for between three and four months. Metropolitan Life should be required to compensate [Appellants] for the value of the use of this money.

For mathematical ease, I will assume that Metropolitan Life had the use of

---

**2.** Appellants' abuse-of-process lawsuit ultimately was dismissed on grant of preliminary objections, which was upheld on appeal. *Lesoon v. Metropolitan Life Ins. Co.,* 737 A.2d 1285 (Pa.Super.1999) (unpublished memorandum), *appeal denied,* 560 Pa. 686, 742 A.2d 675 (1999).

**3.** As noted *supra,* Mr. Sherman and Mr. Sabilla were dismissed from the action prior to trial after MetLife stipulated that they were acting on behalf of MetLife when Appellants purchased the universal policy.

**4.** Appellants withdrew their breach of contract claim at the conclusion of the trial. *See* N.T. Trial, 4/15/03, at 375.

$185 for four full months. If I use the prime rate of 10.5% that governed delay damages under [Pa.R.C.P.] 238, [Appellants] would be entitled to damages of approximately $6.50 plus 6% interest from July 1990. Since these damages (approximately $14.85) are less than $33.33, [Appellants] are entitled to a damage award of $100.[4]

[4] Section 9.2(a) of the Consumer Protection Law only authorizes a court to award three times the actual damages sustained it does not allow an award of three times $100 where actual damages are less than $33.33.

I find that under the evidence most favorable to [Appellants], there are no other damages that [they] sustained from any of the conduct that misled [them] as to the nature of the transaction . . . .

Trial Court Memorandum and Verdict, *supra* at 7–8.

¶ 11 Both parties filed post-trial motions. Appellants argued, *inter alia*, that the damage award was inadequate and that they were entitled to exemplary damages based on MetLife's unscrupulous conduct. MetLife countered that the evidence of record necessitated a finding of zero damages and that the trial court erred in determining that the applicable statute of limitations did not begin to run until June 1989. The court declined to grant post-trial relief to either party; this timely appeal and cross-appeal followed.

¶ 12 Appellants raise four issues on appeal, asserting that the trial court erred in: (1) adopting a narrow interpretation of the UTPCPL and failing to award restitution, *i.e.*, compensate Appellants for the $50,000 policy that they attempted to purchase from MetLife; (2) failing to consider evidence that MetLife engaged in similar misconduct with several other policyholders; (3) concluding that the evidence was insufficient to support an award of punitive

damages; and (4) denying Appellants' request for attorneys' fees. In its cross-appeal, MetLife contends that the trial court erred in awarding damages and determining that the action was not barred by the statute of limitations. We first examine MetLife's arguments.

¶ 13 We begin with MetLife's contention that the action was time-barred. Specifically, MetLife asserts that Appellants' UTPCPL claims were barred by a two-year statute of limitations that began to run on March 7, 1989, the date Mr. Lesoon executed the contract for the universal policy. In the alternative, MetLife posits that the action filed on April 21, 1995, was not initiated within six years of the date Appellants could have detected the unauthorized withdrawals from Mrs. Lesoon's checking account.

The statute [of limitations] begins to run "as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations." *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 503 Pa. 80, 468 A.2d 468, 471 (1983). A person asserting a claim "is under a duty to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based and to institute suit within the prescribed statutory period." *Id.*

The statute of limitations requires "aggrieved individuals to bring their claims within a certain time of the injury, so that the passage of time does not damage the defendant's ability to adequately defend against claims made . . . the statute of limitations supplies the place of evidence lost or impaired by lapse of time, by raising a presumption which renders proof unnecessary." *Dalrymple v. Brown*, 549 Pa. 217, 701 A.2d 164, 167 (1997). Statutes of limitations

"are designed to effectuate three purposes: (1) preservation of evidence; (2) the right of potential defendants to repose; and (3) administrative efficiency and convenience." *Kingston Coal Company v. Felton Min. Co., Inc.,* 456 Pa.Super. 270, 690 A.2d 284, 288 (1997). *Aquilino v. Philadelphia Catholic Archdiocese,* 884 A.2d 1269, 1275 (Pa.Super.2005) (quoting *Meehan v. Archdiocese of Philadelphia,* 870 A.2d 912, 919 (Pa.Super.2005)).

¶ 14 This Court has repeatedly observed that the UTPCPL is governed by a six-year statute of limitations. *Gabriel v. O'Hara,* 368 Pa.Super. 383, 534 A.2d 488 (1987); *Keller v. Volkswagen of America, Inc.,* 733 A.2d 642 (Pa.Super.1999). Therefore, the initial action, which was instituted on April 24, 1991, clearly was filed within the statutory period. In regard to the action filed on April 21, 1995, the trial court found that the statute of limitations did not begin to run until Appellants learned of the unauthorized withdrawals from Mrs. Lesoon's checking account in June 1989. MetLife challenges the court's determination, claiming that Appellants had notice of the forgery in April 1989 when Appellants received the first bank statement evidencing an unauthorized payment to MetLife under the Check–O–Matic Plan. MetLife argues that Appellants' failure to review the April bank statement demonstrates a lack of diligence in detecting the misconduct.

¶ 15 In general, the statute of limitations begins to run at the moment the right to institute and maintain a lawsuit arises. *Aquilino, supra.* However, if the injured party is reasonably unaware of its right to sue, the statute of limitations is tolled by the discovery rule. This Court has observed:

> The discovery rule originated in cases in which the injury or its cause was neither known nor reasonably knowable. The purpose of the rule is to exclude from consideration that period of time during which a party who has not suffered an immediately ascertainable injury remains "reasonably unaware" so that he has essentially the same rights as those who have suffered an immediately ascertainable injury. As the discovery rule has developed, the key point that gives rise to its application is the inability of the injured party, despite the exercise of reasonable diligence, to know that he has been injured and by what cause.
>
> . . . .
>
> The discovery rule applies "to toll the statute of limitations in any case where a party neither knows nor reasonably should have known of his injury and its cause at the time his right to institute suit arises."

*Drelles v. Manufacturers Life Insurance Company,* 881 A.2d 822, 831–32 (Pa.Super.2005) (quoting *Fine v. Checcio,* 582 Pa. 253, 269, 870 A.2d 850, 859 (2005) (internal citations omitted)).

¶ 16 Herein, the trial court concluded that Appellants had no reason to examine their bank statements for evidence of the forgery until they learned that two checks bounced in June. We concur with the trial court. As Mr. Lesoon had been advised that he would not be enrolled in the Check–O–Matic Plan, Appellants were not obligated to scrutinize their monthly bank statements after the universal policy was issued. Accordingly, we find that the statute of limitations did not begin to run until June 1989, and the action instituted on April 21, 1995, was filed within the requisite six-year period.

¶ 17 MetLife also challenges the trial court's decision to award nominal damages in the amount of $100. The crux

of MetLife's position is that no damages should have been assessed because: (1) there was no evidence that MetLife profited from its misconduct in this case; and (2) trial exhibits established that Appellants made a profit of $29.55 when MetLife refunded all monies used to pay for the universal policy.

¶ 18 The duty of assessing damages is for the fact-finder, whose decision should not be disturbed on appeal unless the record clearly shows that the amount awarded was the result of caprice, partiality, prejudice, corruption, or some other improper influence. *Skurnowicz v. Lucci,* 798 A.2d 788, 795 (Pa.Super.2002). "In reviewing the award of damages, the appellate courts should give deference to the decisions of the trier of fact who is usually in a superior position to appraise and weigh the evidence." *Ferrer v. Trustees of the University of Pennsylvania,* 573 Pa. 310, 343, 825 A.2d 591, 611 (2002) (quoting *Delahanty v. First Pennsylvania Bank,* 318 Pa.Super. 90, 464 A.2d 1243, 1257 (1983)). The damage calculation need not be determined with complete accuracy, but it must be founded on a reasonable factual basis, not conjecture. *Skurnowicz, supra.*

¶ 19 MetLife's argument that Appellants did not sustain any damages as a result of Mr. Sabilla's misrepresentations is baseless. The fact that MetLife did not profit from the forgery because the company eventually returned Appellants to their original position is irrelevant. Furthermore, based on our review of the record, we find merit in Appellants' contention that the trial court erred in limiting the damage award to the interest payable on the $185 used to fund the universal policy over a four-month period. We now turn to Appellants' claim challenging the propriety of the damage award.

¶ 20 Appellants maintain that they were entitled to restitution damages under the UTPCPL based on the fraud committed herein and that the trial court erred in finding that rescission was the only remedy available to them. In leveling this claim, Appellants assert that the trial court's refusal to award restitution damages was improper under *Metz v. Quaker Highlands, Inc.,* 714 A.2d 447 (Pa.Super.1998), and *Agliori v. Metropolitan Life Ins. Co.,* 879 A.2d 315 (Pa.Super.2005).

¶ 21 Before we proceed to analyze the trial court's application of the UTPCPL, we observe that the statute makes it unlawful for persons, corporations, and other legal entities to engage in "unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201–3. The term "unfair or deceptive acts or practices" is defined in 73 P.S. § 201–2(4); prohibited acts include false advertising, misrepresenting the condition of a product, disparaging the goods or services of another by false representation of fact, and engaging in fraudulent conduct that creates a likelihood of confusion or misunderstanding. Aimed at preventing consumer fraud, the UTPCPL enables an individual to institute a private action to recover damages for any ascertainable loss caused by unfair or deceptive acts or business practices. The statute provides in relevant part:

§ 201–9.2. **Private actions**

(a) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act, or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred

dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.

73 P.S. § 201–9.2(a).[5]

¶ 22 In the instant case, Appellants contend that the verdict is inconsistent with the underlying purpose of the UTPCPL, *i.e.*, fraud prevention, because the trial court merely returned the parties to the status quo that existed before any fraudulent acts were committed. Citing *Metz*, *supra*, and *Agliori*, *supra*, Appellants argue that MetLife should be required to compensate them for the value of the $50,000 policy that was promised to them by Mr. Sabilla. More succinctly, Appellants assert that they are entitled to recover the total amount it would have cost to fund the universal policy that they agreed to purchase from Mr. Sabilla because it was a bargained-for exchange, and Mr. Lesoon's assent was procured by fraud. According to Appellants, the trial court's failure to award restitution or "benefit-of-the-bargain" damages in this instance was contrary to the spirit of the UTPCPL and the holding in *Metz* and *Agliori*.

¶ 23 In *Metz*, the plaintiffs contracted with the defendant to buy land on which they planned to build a home. Shortly thereafter, the plaintiffs discovered that the defendant fraudulently concealed the existence of a condition on the lot that would increase their construction costs. When the defendant refused to offset the additional costs to remedy the problem, the plaintiffs filed an action seeking rescission and damages for fraudulent misrepresentation under the UTPCPL. The trial

court entered judgment in favor of the plaintiffs, ordered rescission of the sale contract, and awarded treble damages and attorneys' fees pursuant to the UPTCPL.

¶ 24 The defendant challenged the damage award, asserting that once the contract was rescinded, the plaintiffs could no longer recover monetary damages. The trial court rejected that argument, noting the distinction between general principles of contract law and the UTPCPL, which was enacted to deter consumer fraud. The court observed:

> Although Defendant's position that rescission is an alternative remedy to damages is correct as a general rule, it must be remembered that the damages contemplated in that context are **contract** damages. Treble damages under the UTPCPL are based on **fraud**. Fraud damages are not an alternative remedy to either contract damages or rescission of a contract. Fraud damages include a punitive element absent from those other remedies, as do the UTPCPL treble damages.

*Metz*, *supra* at 449 (emphasis in original). Consistent with this view, the court awarded treble damages based upon the actual loss incurred by the plaintiffs as a direct result of the defendant's misconduct, stating as follows:

> In the instant case, upon entering the contract with Defendant, Plaintiffs had expected to be able to build a home of a certain size at a certain cost on a lot that was not located on fill. Defendant fraudulently concealed the fact that the lot it sold Plaintiff was located over fill rather than being on its natural state. The amount to be trebled would there-

---

5. Subsection (a) of 73 P.S. § 201–9.2 was amended in 1996 to allow an award of attorneys' fees and costs. The significance of this amendment will be discussed *infra* when we address Appellants' contention that the trial court erred in failing to award attorneys' fees in this action.

fore consist of the down payment and transactional costs of the sale plus the increase in the price of a comparable lot, the increase in the cost of construction of a comparable home, and the increase in the interest rates Plaintiffs will now have to pay to be able to begin building a comparable house on a comparable lot at this point in time. This amount, as calculated by Plaintiffs' expert, William Wesley Palmer, CPA, and essentially unchallenged by Defendant, is $40,904.99 .... Therefore, treble damages are $122,714.97.

*Id.* (alteration in original) (citation to trial court opinion omitted). This Court adopted the trial court's reasoning and upheld the award of treble damages, noting that the defendant's refusal to resolve the matter when the defect was discovered forced the plaintiffs to bring suit.

¶ 25 In contrast to *Metz*, the primary issue in *Agliori* was whether the plaintiff suffered an ascertainable loss under the UTPCPL. The plaintiff in *Agliori*, James Donahue, surrendered three whole life insurance policies to the defendant-insurer in exchange for a new universal life policy with a death benefit of $50,000 during the first year and $40,000 thereafter. When Mr. Donahue subsequently discovered that the terms of the universal life policy were different than he was led to believe, he brought suit against the insurer seeking damages for fraudulent misrepresentation. Approximately three years after filing an amended complaint, Mr. Donahue died, and the executrix of his estate was substituted as plaintiff. Thereafter, the case proceeded to a nonjury trial, and the court determined that the insurer had engaged in deceptive acts in violation of the UTPCPL. However, since the insurer paid Mr. Donahue's estate $40,000 plus interest upon his death, the court found that Mr. Donahue received the policy he had intended to purchase, and thus, there was no ascertainable loss.

¶ 26 The executrix appealed, contending that there was an ascertainable loss because the projected value of the three surrendered policies would have been greater than the amount paid under the universal life policy if they had still been in existence on the date of Mr. Donahue's death. Upon review, this Court agreed with the executrix, reasoning as follows:

Because the transaction misrepresented by [the insurer] involved not just the purchase of a universal life policy, but also the surrender of three whole life policies, it is necessary to examine the terms of **all** the policies that constituted the transaction. Specifically, to determine if Mr. Donahue has suffered an ascertainable loss, the court must make the following factual determinations: compare the death benefit that his estate actually received (from the universal life policy) with the benefit that his estate would have received had he never entered the transaction in question, but instead just maintained his three whole life policies. Appellant's evidence suggests that the estate would have received a greater benefit if Mr. Donahue had never entered the transaction. The court acknowledges that it might have considered this evidence, had it found that the estate was entitled to actual damages. But it is not only for an award of actual damages that such evidence must be considered. Rather, the evidence is also highly relevant to a determination of whether Mr. Donahue suffered an ascertainable loss attributable to [the insurer's] misrepresentations.

We are aware that the difference in death benefit provided by Mr. Donahue's universal life policy compared to the benefit that would have been provid-

ed by his three surrendered whole life policies is a function of when he died. As pointed out by the trial court, for many years after Mr. Donahue's purchase of the universal life policy, the $40,000 death benefit provided by that policy exceeded the death benefit that would have been provided by his three surrendered whole life policies. However, since Mr. Donahue lived for approximately twelve years after purchasing the universal life policy, the evidence presented suggests that the death benefit provided by his surrendered policies would have exceeded $40,000 by that time. This is because the surrendered policies steadily increased in value due to reinvestment of the dividends toward the purchase of additional coverage. Had Mr. Donahue died earlier, when the $40,000 death benefit from his universal life policy was greater than what the benefit would have been under his three surrendered policies, we would be more inclined to agree with the trial court that his estate had suffered no ascertainable loss, as required to prevail under the UTPCPL. However, this is not what occurred. Ascertainable loss must be established from the factual circumstances surrounding each case, and in Mr. Donahue's case the evidence presented indicates that his estate suffered an ascertainable loss due to misrepresentations by [the insurer] that induced Mr. Donahue to change his life insurance policy.

*Agliori, supra* at 321 (emphasis in original).

¶ 27 In the case *sub judice,* Appellants argue that they, like the plaintiffs in *Metz* and *Agliori,* should have been awarded compensatory damages calculated in relation to the terms of the underlying transaction that gave rise to the UTPCPL violation. Appellants maintain that they are entitled to the benefit of the contract that was promised to Mr. Lesoon, and therefore, the trial court should have fashioned an award designed "to cover the increase in the price of a comparable insurance policy that MetLife promised [to] them." Appellants' brief at 23. For reasons discussed *infra,* we agree.

¶ 28 The trial court declined to award compensatory damages relative to the value of the universal policy because Met-Life representatives met with Appellants after they objected to the unauthorized withdrawals from Mrs. Lesoon's checking account, acknowledged the forgery and misrepresentations, returned all wrongly-obtained funds, restored the $5,000 family policy to its original state, and rescinded the universal policy at Appellants' request. Consistent with this view, the court concluded that Appellants did not suffer any ascertainable loss beyond the short-term use of the $185 that was paid into the universal policy before Appellants discovered the unauthorized withdrawals. The court stated as follows:

[B]efore this lawsuit was instituted, at plaintiffs' request, Metropolitan Life had restored plaintiffs to the status quo. Plaintiffs cannot now claim the loss of benefit of the bargain damages because rescission is an alternative remedy. Plaintiffs' reliance on *Metz v. Quaker Highlands, Inc.,* 714 A.2d 447 (Pa.Super.1998), is misplaced. In that case, the plaintiff was awarded only the money necessary to place the plaintiff in the same position as if the contract had never been made. In the present case, plaintiffs were already in the same position as if the transaction had never occurred at the time the lawsuit was filed.

Trial Court Memorandum and Verdict, 5/9/03, at 10.

¶ 29 We disagree with the court's assessment. As Appellants accurately point out,

the damage award in *Metz* included the value of the plaintiffs' down payment and transactional costs "plus the increase in the price of a comparable lot, the increase in the cost of construction of a comparable home, and the increase in the interest rates [the] Plaintiffs [would] have [had] to pay to be able to begin building a comparable house on a comparable lot...." *Metz, supra* at 449. Thus, contrary to the trial court's position, the *Metz* Court did not simply return the plaintiffs to their original position; it compensated the plaintiffs for the additional costs they would incur in subsequent transactions required to fulfill the initial contract.

¶ 30 In the case at bar, MetLife's agent, Mr. Sabilla, induced Mr. Lesoon to purchase additional insurance by misrepresenting the terms of the universal policy. Appellants altered their lifestyle to raise funds to pay for the new policy. Thereafter, an unidentified MetLife employee forged Mrs. Lesoon's signature on a document permitting automatic withdrawals from her checking account. When Appellants discovered the unauthorized withdrawals, MetLife quickly refunded all monies paid into the universal policy. However, despite issuing a refund, MetLife did not take immediate steps to return Appellants to their original position, nor did the company readily admit what had actually transpired, as the trial court opinion implies.

¶ 31 Mr. Lesoon testified that he spoke with MetLife employees on multiple occasions in an effort to determine how the withdrawals occurred, and no one suggested forgery as a possible cause. In fact,

Appellants were initially told that the unauthorized withdrawals were the result of "human [or] ... computer error." N.T. Trial, 4/14/03, at 37. Unconvinced, Appellants made repeated demands to examine the withdrawal authorization form, which was not shown to them until their **second** meeting with MetLife employee Gary Antonino. *See id.* at 46–47. During Appellants' first meeting with Mr. Antonino, he took the opportunity to explain the true terms of the universal policy and attempted to persuade Appellants to keep the policy. Following the second meeting, which occurred in January 1990, Appellants asked MetLife to rescind the universal policy and restore the $5,000 family policy to its original state. MetLife did not comply with this request until June 1990, approximately fifteen months after Mr. Lesoon originally agreed to purchase the universal policy from Mr. Sabilla.[6]

¶ 32 Appellants subsequently filed suit seeking compensatory and punitive damages under the UTPCPL. Following a nonjury trial, the judge found that a UTPCPL violation occurred, but decided to award nominal damages on the rationale that Appellants were not harmed by MetLife's misdeeds. The court also found there was no evidence that Appellants sustained an ascertainable loss in excess of $100. The record does not support these determinations.

¶ 33 At the conclusion of the evidence, the trial court heard argument regarding the issue of compensatory damages. Appellants' counsel asserted that Appellants should receive the sum of $531 multiplied

---

**6.** At the nonjury trial, Mr. Lesoon conceded that a portion of the delay was attributable to the fact that Appellants had stopped making monthly premium payments on the $5,000 policy. *See* N.T. Trial, 4/14/03, at 86. However, Mr. Lesoon explained that he and his wife were unable to make those payments because they did not have a coupon book for the $5,000 policy; Mr. Sabilla took the original coupon book with him when he left Appellants' residence in March 1989, and MetLife ignored multiple requests for a new coupon book. *See id.* at 28, 86.

by the life of the fifty-six year policy, or $29,736. As noted above, the trial court concluded that nominal damages were appropriate because MetLife acknowledged the fraud, rescinded the contract, and returned Appellants' money.

¶ 34 On appeal, Appellants reiterate their contention that the proper measure of damages is $29,736. MetLife counters that the issue is waived because Appellants did not present any testimony concerning damages at the nonjury trial. As the issue was addressed on the record at the conclusion of the trial, we reject MetLife's waiver argument. Furthermore, the testimony presented during the trial unequivocally established that Appellants failed to receive the benefit of the contract that Mr. Lesoon signed, and Appellants could not afford the policy that they actually received. Therefore, at a minimum, Appellants should be compensated for the difference in price between the policy that was promised to them and the policy that was issued. Accordingly, we vacate the existing compensatory damage award and remand for the trial court to re-examine this issue consistent with our analysis. In so doing, we decline to express any opinion as to the propriety of Appellants' claim that they are entitled to $29,736; the duty of assessing damages is for the trier of fact, and we will not usurp that function. *Skurnowicz, supra.* The trial court must fashion a new award and determine whether treble damages are warranted.

¶ 35 Appellants' second argument is that the trial court erred in failing to consider evidence that MetLife engaged in deceptive business practices with numerous policyholders. Appellants claim that this evidence was crucial to their case-in-chief because it would have established that MetLife intentionally defrauded Appellants by forging Mrs. Lesoon's signature, misrepresenting the terms of the universal policy, and altering the $5,000 family policy without Mr. Lesoon's consent. Appellants also allege:

[T]he evidence ... proved MetLife's motive, intent, absence of mistake, a common scheme, and provided a logical connection between the business practice and the fraudulent sale that occurred in this case. Such evidence would tend to demonstrate that MetLife ... engaged in a regular practice of misrepresenting the cost of policies to "churn" existing policies and used forgery of policyholder signatures as a business practice. As such, evidence of these practices are relevant and admissible to demonstrate (1) motive, (2) intent, (3) a common scheme in the deceptive sale of life insurance policies, (4) that MetLife has not merely committed a mistake when [the] terms and conditions of the $50,000 policy was [sic] misrepresented to the Lesoons, and (5) to establish the identity of the person charged with the commission of fraud on trial....

Appellants' brief at 40. Finally, Appellants posit that the evidence at issue was "relevant ... to pursue a claim for punitive damages." *Id.* at 43.

¶ 36 In addressing Appellants' post-trial motions, the trial court explained that it did not consider the evidence in question because Appellants did not raise this issue in a timely manner. The court stated:

The allegations of corporate-wide unfair and deceptive business practices were initially made in the April 21, 1995 complaint. Fraud claims raised in this complaint are barred by the two-year statute of limitations (42 Pa.C.S. § 5524(7)). Thus, there was no need to make findings as to corporate-wide unfair and deceptive practices.

Memorandum and Order of Court, 12/30/03, at 3 (footnote omitted). Appellants counter that the trial court's rationale for ignoring the evidence was specious because the allegations of corporate-wide wrongdoing did not constitute a separate cause of action. Rather, they argue that evidence of similar misconduct involving other policyholders was relevant to establishing that MetLife acted with reckless disregard of Appellants' rights.

¶ 37 Assuming that the evidence of widespread deceptive practices was offered solely to establish intent, absence of mistake, and a common scheme to defraud MetLife policyholders, we fail to see how that evidence was relevant to any material issue at trial except punitive damages. Hence, we turn to Appellants' related argument that the trial court abused its discretion in finding that the evidence would not support an award of punitive damages. Appellants contend that the misrepresentations concerning the universal policy, the forgery, and the corporate-wide deceptive practices were sufficient to create a jury question on the issue of punitive damages. Based on our review of the record, we agree.

"Punitive damages are awarded to punish a defendant for certain outrageous acts and to deter [it] or others from engaging in similar conduct." *G.J.D. v. Johnson*, 552 Pa. 169, 713 A.2d 1127, 1131 (Pa.1998) (citation omitted) (emphasis deleted). In general, the assessment of punitive damages is proper whenever a party's actions are of such an outrageous nature as to demonstrate intentional, willful, wanton or reckless conduct resulting from either an evil motive or because of a reckless indifference to the rights of others. *Ruffing v. 84 Lumber Co.*, 410 Pa.Super. 459, 600 A.2d 545, 551 (Pa.Super.1991). It is the role of the trial court to determine, in its discretion, whether the plaintiff has presented sufficient evidence from which a jury could reasonably conclude that the defendant acted outrageously. *Slappo v. J's Development Assoc., Inc.*, 791 A.2d 409, 417 (Pa.Super.2002)....

*Angelopoulos v. Lazarus PA Inc.*, 884 A.2d 255, 262 (Pa.Super.2005). The determination of whether the defendant's actions constituted outrageous conduct is within the sound discretion of the trier of fact and will not be disturbed on appeal absent an abuse of that discretion. *Pestco, Inc. v. Associated Products, Inc.*, 880 A.2d 700 (Pa.Super.2005).

An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will. An abuse of discretion will not be found where an appellate court simply concludes that it would have reached a different result than the trial court. If the record adequately supports the trial court's reasons and factual basis, an appellate court may not conclude the court abused its discretion.

*Brodowski v. Ryave*, 885 A.2d 1045, 1055 (Pa.Super.2005) (quoting *Blicha v. Jacks*, 864 A.2d 1214, 1217 (Pa.Super.2004) (citations omitted)).

¶ 38 In the instant case, the trial court declined to submit the issue of punitive damages to a jury based on its conclusion that the forgery which precipitated the unauthorized withdrawals from Mrs. Lesoon's checking account was "not fraudulent conduct that would be undetected or that could not be readily remedied ...." Trial Court Memorandum and Verdict, *supra* at 14. In addition, the court reasoned that the "[the forgery was] not conduct that would cause a substantial injury." *Id.* We reject this assessment, noting that Appellants presented evidence of numerous

instances of willful misconduct in this case and in similar transactions reviewed by Mr. Engel. The fact that MetLife's actions were detectible and easily remedied is immaterial; the evidence submitted clearly demonstrated that MetLife acted with reckless indifference to the rights of others. Therefore, contrary to the trial court's position, we find that Appellants presented sufficient evidence to place the issue before a jury. *Accord Noyes v. Cooper,* 396 Pa.Super. 592, 579 A.2d 407 (1990) (trial court erred in refusing to submit issue of punitive damages to jury where plaintiff presented evidence that defendants fraudulently misrepresented plaintiff's medical condition to support denial of workers' compensation benefits). Moreover, as Appellants suggest, we believe the jury should be informed of MetLife's corporate-wide deceptive sales practices because that evidence is relevant to establishing intent to defraud and absence of mistake.

¶ 39 Finally, Appellants assert that the trial court erred in refusing to award attorneys' fees in this matter.

Our standard of review is deferential. The decision to award attorneys' fees incurred in bringing an action is within the discretion of the trial court, and we will reverse a trial court's decision on the matter only in the event of a palpable abuse of discretion. *Thunberg v. Strause,* 545 Pa. 607, 614–615, 682 A.2d 295, 299 (1996). "If the record supports a trial court's finding of fact that a litigant violated the conduct provisions of the relevant statute providing for the award of attorney's fees, such award should not be disturbed on appeal." *Id.* *Diener Brick Company v. Mastro Masonry Contractor,* 885 A.2d 1034, 1041–42 (Pa.Super.2005).

¶ 40 As noted, 73 P.S. § 201–9.2(a) was amended in 1996 to give trial judges discretionary authority to award attorneys' fees in cases arising under the UTPCPL. In the case at bar, Appellants contend that the trial court should have awarded attorneys' fees for legal work performed before and after February 2, 1997, the effective date of the 1996 amendment.

¶ 41 Appellants' claim that they can recover fees incurred prior to the effective date of the 1996 amendment is without merit. In *Agliori, supra,* this Court examined pertinent case law and held that as a matter of law, the statutory language in effect prior to the 1996 amendment did not allow courts to award attorneys' fees. Thus, we affirm the trial court's decision to deny attorneys' fees for legal work performed before February 2, 1997.

¶ 42 With respect to attorneys' fees incurred after February 2, 1997, the trial court reasoned that an award of fees was not warranted in this case because MetLife returned Appellants to their original position before they retained counsel and offered to settle the matter amicably for $500. *See* Trial Court Memorandum and Order, 9/14/04, at 2–3. In light of our decision to modify the compensatory damage award and remand for further proceedings, we will defer judgment on this issue and permit the trial court to reconsider its ruling after punitive damages, if any, are assessed.

¶ 43 For the reasons stated herein, we vacate the judgment and remand for further proceedings consistent with this opinion.

¶ 44 Judgment vacated. Case remanded. Jurisdiction relinquished.