J. A27014/14

2015 PA Super 120

| | | |
|---|---|---|
| ROBERT J. BOEHM AND | : | IN THE SUPERIOR COURT OF |
| BEVERLY LYNN BOEHM | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| RIVERSOURCE LIFE INSURANCE | : | |
| COMPANY AND JAMES DAY, II, | : | No. 1999 WDA 2013 |
| | : | |
| Appellants | : | |

Appeal from the Judgment Entered December 13, 2013,
in the Court of Common Pleas of Allegheny County
Civil Division at No. G.D. 01-008289

BEFORE: FORD ELLIOTT, P.J.E., SHOGAN AND MUSMANNO, JJ.

OPINION BY FORD ELLIOTT, P.J.E.: **FILED MAY 19, 2015**

Riversource Life Insurance Company ("Riversource") and James Day, II, appeal from the judgment entered December 13, 2013, following a non-jury trial on plaintiffs/appellees', Robert J. Boehm and Beverly Lynn Boehm, Unfair Trade Practices and Consumer Protection Law ("UTPCPL") claims. This is one of a series of cases in Allegheny County alleging fraudulent misrepresentation in connection with the sale of life insurance policies. Judgment was entered for the plaintiffs in the amount of

$295,305.78, including attorneys' fees and costs. After careful review, we affirm.[1]

A jury trial resulted in a defense verdict on plaintiffs' common law fraud claims. The parties then proceeded to a non-jury trial before the Honorable Paul F. Lutty, Jr., on the UTPCPL claims.[2] Using a preponderance of the evidence standard, the trial court found that the defendants purposely and intentionally misrepresented the terms of the policy. The trial court found the plaintiffs' testimony on the contested issues to be credible, and that of the defendants to be not credible. (Trial court opinion, 2/24/14 at 2.) The trial court adopted the plaintiffs' proposed findings of fact and conclusions of law, and awarded $125,000 in damages. Those factual findings, in their entirety, are as follows:

> 1. On November 20, 1986, Douglas Sedlak and Barry Wilhide on behalf of American Express and IDS Life approached Robert and Beverly Boehm in order to do a financial and insurance analysis and asked the Plaintiffs questions relating to their current financial status, existing life insurance coverage, and insurance and financial goals. Testimony of Beverly Boehm, Trial Transcript, pp. 509:24–511:8

---

[1] Appellants purport to appeal from the December 12, 2013 order denying post-trial motions. "An appeal from an order denying post-trial motions is interlocutory. Thus, it follows that an appeal to this Court can only lie from judgments entered subsequent to the trial court's disposition of any post-verdict motions, not from the order denying post-trial motions." **Johnston the Florist, Inc. v. TEDCO Const. Corp.**, 657 A.2d 511, 514 (Pa.Super. 1995) (citations omitted). We have amended the caption accordingly.

[2] **See Fazio v. Guardian Life Ins. Co.**, 62 A.3d 396, 411 (Pa.Super. 2012), **appeal denied**, 72 A.3d 604 (Pa. 2013) (no right to jury trial for private causes of action under the UTPCPL).

("He asked if we could do the financial analysis. They gathered information for that to run the analysis. So they were asking a lot of questions and financial information that they needed to run the projections.")

2. As a result of the financial analysis, a recommendation was made on or about November 28, 1986 for the Boehms to cash-surrender their existing Prudential Insurance policies and replace them with a $100,000 universal life insurance policy from IDS Life. The policy provided $100,000 on Mr. Boehm and $100,000 on Mrs. Boehm. See Trial Exhibit 2, Bates No. 000125; Testimony of Beverly Boehm, Trial Transcript, pp. 511:9-512:9.

3. To get the policy started the Boehms were directed to deposit a "start-up fee" of $2,000 into the policy. See Trial Exhibit 6; Testimony of Beverly Boehm, Trial Transcript, pp. 514:17-20.

4. The Boehms were informed that the premium payments were $50 per month thereafter. See Testimony of Beverly Boehm, Trial Transcript, pp. 516:17-19.

5. Between December 1986 and January 1996, the Boehms were billed monthly in the amount of $50.00. See Testimony of Beverly Boehm, Trial Transcript, pp. 516:20-516:25.

6. The Boehms paid the $50.00 monthly bills to IDS for the 1986 Policy. Id.

7. In November of 1995, the Boehms were called on the telephone by James Day, who represented that he was their new financial advisor and that he wanted to review their 1986 UL policy with IDS Life since he believed it may need to be replaced. See Testimony of Beverly Boehm, Trial Transcript, pp. 517:11-

518:1 ("It was like around December, [Day] called, and he said that we would need to have a meeting, that the policy, the Universal Life policy was going to be obsolete and outdated, and we really needed to set a meeting. He'd really like to talk with us.")

8. The Boehms scheduled a meeting with James Day in late 1995, but it had to be rescheduled. They were unable to meet until Monday January 29, 1996. See Testimony of Beverly Boehm, Trial Transcript, pp. 518:2-518:14.

9. At the meeting on January 29, 1996, James Day explained that the 1986 UL was outdated and had to be replaced. See Testimony of Beverly Boehm, Trial Transcript, pp. 521:18-522:2 ("Q. What did he tell you about your 1986 UL Policy at that meeting? A. He explained to us that the Universal Life policy from '86 was going to be obsolete. He was telling us that was going to be like in jeopardy. He could take the cash value of the Universal Life policy and roll it into a new vehicle, which would then be the Variable he then proposed.").

10. At the meeting on January 29, 1996, James Day recommended that the Boehms replace the 1986 $100,000 UL policy with a new product offered by IDS Life, a variable universal life insurance policy (VUL) that would also provide $100,000 in coverage on Mr. Boehm and $100,000 in coverage on Mrs. Boehm through a spousal rider, just like the 1986 UL Policy.

A. Well, I remember there being a cash value from the UL that he had said would be in jeopardy if we didn't move it. So, he said he could move that, I believe, $5,400 over, into the cash value of this

policy, and that cash value wouldn't be lost.

The payments -- for the monthly payments I had told him they were $50 in the other policy. He said this would be $50 also. So, this would be $50.

I said but it was a $100,000 policy. He said it would be $100,000 for Robert. But I think I was a rider on the other policy. He said you'll still be a rider on this policy. So, I says it would be $50 a month. He said that was the yearly figure, $600. It was 50 times 12 for a year. He was showing the yearly.

See Testimony of Beverly Boehm, Trial Transcript, pp. 524:13-525:5[.]

11.    James Day explained that the monthly cost of the new 1996 VUL policy would remain the same at $50 per month. Also, they should cash-surrendering [sic] the 1986 UL policy and rolling-over the cash-surrender amount of $5,400 into the new 1996 VUL policy. The cash-surrender amount would cover the start-up fee. See Testimony of Beverly Boehm, Trial Transcript, pp. 524:13-525:5[.]

12.    In conformation [sic] of his sales representations, James Day completed the premium payment amount section in the application for the new 1996 VUL policy in the amount of $600 per year. (A premium payment of $600 per year equals 12 monthly payments of $50). See Testimony of Beverly Boehm, Trial Transcript pp. 526:12-20; 537:4-18; Trial Exhibit 62.

13.    James Day also completed the application sections indicating that the 1986 UL would be

replaced by the new 1996 VUL policy and that 100% of the cash-surrender amount would be transferred from the 1986 UL policy into the new 1996 VUL policy. See Testimony of Beverly Boehm, Trial Transcript pp. 537:19-538:7; Trial Exhibit 62.

14. Since the Boehms were not informed by James Day to bring their financial information with them to the meeting, the application could not be completed. See Testimony of Beverly Boehm, Trial Transcript pp. 526:18-527:5.

15. James Day then had the application highlighted and mailed to the Boehms as part of a packet of documents that required the Boehms to complete and/or sign and return. See Trial Exhibit 101; Testimony of Beverly Boehm, Trial Transcript pp. 526:15-18; 532:9-533:1.

16. The Boehms read and completed the application and signed where indicated. See Trial Exhibit 101; Testimony of Beverly Boehm, Trial Transcript pp. 526:15-18; 532:9-533:1.

17. The Boehms also read the information completed by James Day on the application regarding the premium payment amount of $600 annually and the transfer of the cash-surrender amount from the 1986 UL policy. See Testimony of Beverly Boehm, Trial Transcript pp. 537:19-538:7.

18. Included in the packet of information was also a copy of a sales illustration for the policy, which showed payments of $600 per year, with an initial dump-in of the $5,400. See Trial Exhibit 101; Testimony of Beverly Boehm, Trial Transcript pp. 532:3-532:8.

19. At trial, Jack Kis[p]ert, a Vice President of IDS Life, testified that the dollar amounts set forth on the sales illustration had a ZERO percent chance of working as set forth on the

illustration.   Specifically, Kispert testified as follows:

Q.   IDS Life has no ability to project the future performance of this policy with any accuracy beyond one year.  Isn't that true?

A.   We can't even -- for the overall performance, we can't predict it for more than one day because it's invested in the underlying funds.

That's the cash value.   We can predict death benefits that could be in effect because this has a death benefit guarantee feature in it.

Q.   So the Boehms -- slide it up.  Let me rephrase.  It would be wrong of the Boehms to believe that this policy is actually going to grow in value as set forth on this illustration.  Is that true?

A.   It's not wrong for them to believe that.  The illustration also includes the zero percent rate of return to give them an idea of the range of possibilities to make an informed decision.

* * *

Q.   What is the likelihood or chance that this illustration is going to work exactly as set forth for the first 20 years?

A.   You asked what's the likelihood that this would be exactly as illustrated?

Q.   Yes.

A. Zero. Because he might have earned ten percent one day. He might have better than ten percent. One day less than ten percent.

So if you say is this going to be exactly true? No, it will never happen precisely like that. It may be better. It may be worse.

Q. So, it will never happen as illustrated. Is that correct?

A. That's correct. Because it's invested in the market. It's a hypothetical performance. It is not actual values. We can't predict the future on investments.

See Testimony of Jack Kispert, Trial Transcript, pp. 153:7-155:11.

20. Jack Kispert further confirmed that even at the ten percent investment rate set forth on the illustration mailed to the Boehms, the policy would not remain in force until age [] 100.

Q. The Boehms put in $50 a month. Any possibility this policy is going to last to age 100?

A. A remote possibility. But based on the illustration at ten percent, it would not.

Q. Even at ten percent it would not make it?

A. Correct.

See Testimony of Jack Kispert, Trial Transcript, pp. 156:5-10.

21. Plaintiff[s'] life insurance sales practices expert, Mark Mikolaj, testified that the policy was destined to lapse from its inception.

22. When the first bill arrived in March of 1987 for the new 1996 VUL policy, it was in the amount of $150.  See Testimony of Beverly Boehm, Trial Transcript pp. 555:14-557:10.

23. After receiving the first bill, Mrs. Boehm called James Day and asked whether there was a mistake in the amount, that is, was the billing set up on a quarterly basis as opposed to a monthly basis.  James Day explained it was a mistake, to disregard the bill and that a corrected bill would be sent for $50 per month.

   A.    We received the first premium bill in March of '96. '96.

   Q.    What happened when you got the bill?

   A.    I was like what is this?  I was like confused.  I opened the bill, and the bill was for 150 some dollars.  I was totally confused why this bill said $150.

         When Bob got home from work I asked did we sign up for like quarterly payments because I could have sworn we said we were doing $50.  It was $50 a month.

         So I was thinking maybe I missed a payment.  Did I forget something?  Was there something in the UL policy that I missed?  I don't remember any other money.  So I immediately looked up his number and thought I got to call and find out what this is.  There's

something wrong. I thought it was being set up quarterly. So I called Mr. Day and asked him what it was about.

Q. What happened during that conversation on the phone?

A. I asked him was this being set up quarterly. I thought we agreed to monthly. He said, oh, yes, it's monthly. I said, well, the bill came in. He said how much is it for. I said, well, I see now it's a hundred fifty some forty-four. I said did I miss something, James? No. No. No. No. You didn't miss anything. I said I don't understand why I'm getting this premium bill. He says that's a mistake. I'll take care of it. I says, oh, okay. I thought I did something wrong. He said, no, no. He says, I'll take care of that for you. I said do you want me to pay this because it's due? Do you want me to send a check? He said, no, no. Don't do anything. I'll take care of it. I'll send a new premium with the new $50. Wait until you receive that, then send the check with the new premium. I'm like okay, I'll wait. So you don't want me to at least send a check ahead? He said no, no, no. It's a mistake. I'll take care of it. I said oh, I thought I did something wrong. I was so confused.

See Testimony of Beverly Boehm, Trial Transcript pp. 555:14-557:10[.]

- 10 -

24. A new bill was sent for $50. See Trial Exhibit 77. See Testimony of Beverly Boehm, Trial Transcript pp. 557:11-557:15.

25. Every bill thereafter was sent for $50 per month. See *i.e[.]* Trial Exhibit 77; Testimony of Beverly Boehm, Trial Transcript pp. 557:16-17.

26. The Boehms paid the monthly bills of $50 per month. See Trial Exhibit 77; Testimony of Beverly Boehm, Trial Transcript pp. 579:14-581:1.

27. Unknown to the Boehms, when the 1996 VUL policy was approved by the underwriting department at IDS Life, the premium amount was tripled, increasing from $600 annually to $1,800 annually. See Trial Exhibit 100.

28. The Underwriting Department provided written instructions to James Day to personally deliver and witness the amendment to the policy increasing the premiums. See Trial Exhibit 100.

29. Instead of personally delivering the policy, as directed to do in writing by the underwriting department, James Day had his assistant, Donna mail the policy to the Boehms. See Trial Exhibit 75; Testimony of Beverly Boehm, Trial Transcript pp. 552:1-17.

30. The cover letter, dated April 8, 1996, which was sent with the policy, failed to provide any explanation that the policy as issued differed materially from the policy as delivered in that the premium amount was tripled by IDS Life and therefore the premiums were increased from $600 annually to $1,800 annually. See Trial Exhibit 75.

31. When the policy was delivered by mail in April of 1996, the Boehms, not realizing that any

change took place between the terms as sold and the terms as issued, did not read the policy.

32. After receiving bills for $50 per month and paying the same for the next four and one half years, in September of 2000, the Boehms received a letter from IDS Life informing them that they needed to increase their premium payments to $150 per month or they would lose their guaranteed death benefit rider (which ends at age 70). See Trial Exhibit 86; Testimony of Beverly Boehm, Trial Transcript pp. 563:24-564:22.

33. Upon receiving the September 2000 letter, the Boehms were confused as to why the letter was sent and called the "800" number in the letter. See Testimony of Beverly Boehm, Trial Transcript pp. 563:24-566:2[.]

34. A meeting was set up with Neal McGrath of IDS Life who informed them, for the first time, that the policy would require premium payments greatly in excess of $50 per month. See Testimony of Beverly Boehm, Trial Transcript pp. 566:3-573:3.

35. Jack Kis[p]ert, a Vice President of IDS Life, testified that the policy provided $200,000 in coverage, $100,000 on Mr. Boehm and $100,000 on Mrs. Boehm.

36. Jack Kis[p]ert, a Vice President of IDS Life, testified that the amount necessary to guarantee that the policy as sold with $200,000 of coverage would be funded for its entire duration was $240 per month.

> Q. How much would it cost the Boehms to guarantee that 1996 VUL policy to last all the way to the age 100 in a fixed account?

A.    It would have been about $200 a month if paid on an annual basis.

Q.    Let's take a look at Exhibit 100. I'll show you the second page. It ends with a Bates number of 96.

Just so you understand, do you see in the bottom right hand it says IDS/Boehm with four zeros and 96, confidential? This is a document produced by IDS Life, not by the Boehms.

When the Boehms had produced a document, you will see a number more like this with just a stamp.

A.    Okay.

Q.    So, this came from IDS Life.

You would agree with me that GLAP stands for guideline annual premium. Correct?

A.    Yes. It's the guideline level annual premium.

Q.    That's the one we've been talking about?

A.    Yes.

Q.    It's $2,881.26 as of March 11, 1996. So this would be the issue date for the policy; right?

A.    Yes.

Q.    Okay. So the guideline annual payment was $2,881.26 per year. Correct?

> A. Yes.
>
> Q. If you divide that by 12 in round numbers, doesn't that come to about $240?
>
> A. Yes.
>
> Q. I could put a calculator up. But you would agree?
>
> A. Yes.
>
> See Testimony of Jack Kispert, Trial Transcript, pp. 190:3-191:12.

37. Plaintiff[s'] life insurance sales practices expert, Mark Mikolaj, testified that amount necessary to guarantee that the policy would be funded for its entire duration was $240 per month.

38. The actual cost to the Boehms necessary to guarantee that the policy would remain in force for the duration of the term of the contract at age 100 was $240 per month, not the $50 per month as represented and set forth on the application by James Day.

39. This law suit was filed in 2001, within six years of the purchase of the policy in January of 1996.

Plaintiffs' Proposed Findings of Fact and Conclusions of Law, 7/12/13 at 1-10.

After hearing all the evidence, the trial court determined that the defendants violated the UTPCPL where the policy as issued and delivered differed materially from the policy as sold, the defendants purposely and intentionally misrepresented the terms of the policy, and intentionally failed

to explain to the plaintiffs that the premium amount had materially changed. In addition to statutory damages of $125,000, the trial court awarded reasonable attorneys' fees of $164,890, and costs of $5,415.78. Post-trial motions were denied. Judgment was entered for the plaintiffs and against the defendants on December 13, 2013, in the amount of $295,305.78. This timely appeal followed. Appellants have complied with Pa.R.A.P., Rule 1925(b), 42 Pa.C.S.A., and the trial court has filed an opinion.[3]

Appellants have raised the following issues for this court's review:

1. Whether the trial court erred in applying a preponderance of the evidence burden of proof, rather than a clear and convincing evidence burden of proof, to Plaintiffs' statutory claim under the [UTPCPL], thereby refusing to apply collateral estoppel to the jury's defense verdict on Plaintiffs' identical common law fraud claim?

2. In the alternative, if it were proper to apply a preponderance of the evidence burden of proof to Plaintiffs' UTPCPL claim, whether the trial court erred in determining that Plaintiffs

---

[3] The trial court states that appellants raise 36 separate claims of error in their Rule 1925(b) statement, too many to address individually. (Trial court opinion, 2/24/14 at 1 n.1, citing **Kanter v. Epstein**, 866 A.2d 394 (Pa.Super. 2004), **appeal denied**, 880 A.2d 1239 (Pa. 2005), **cert. denied**, **Spector, Gadon & Rosen, P.C. v. Kanter**, 546 U.S. 1092 (2006) (where an appellant's concise statement raises an unduly large number of issues (104 in **Kanter**), the purpose of Rule 1925 is effectively subverted).) Nevertheless, the trial court was able to address the general issues raised, including liability, damages, and counsel fees. **Id.** In addition, given the relative complexity of this matter, we find that appellants' voluminous Rule 1925(b) statement was not the result of bad faith or an attempt to impede the appellate process. Appellants did winnow down the issues actually raised in their brief. Therefore, we decline to find waiver on this basis. **See Maya v. Johnson and Johnson**, 97 A.3d 1203, 1211 n.4 (Pa.Super. 2014) (declining to find waiver where the subject lawsuit was complex and there was no evidence of bad faith or an attempt to thwart the appellate process).

proved all of the elements necessary for a finding of liability?

3. In the alternative, if it were proper to find liability on Plaintiffs' UTPCPL claim, whether the trial court erred in awarding expectation damages that were not based on the value of the bargain Plaintiffs claim they expected, specifically a death benefit for certain premium payments[?]

4. In the alternative, if it were proper to find liability on Plaintiffs' UTPCPL claim, whether the trial court erred in awarding damages not supported by the evidence presented by either Plaintiffs' or Defendants' damages experts and that was impermissibly speculative?

5. In the alternative, if it were proper to find liability on Plaintiffs' UTPCPL claim, whether the trial court erred in awarding damages that failed to discount the amount awarded to present value where there was no offset required for inflation?

6. In the alternative, if it were proper to find liability on Plaintiffs' UTPCPL claim, whether the trial court erred in awarding attorneys' fees on the UTPCPL non-jury claim that were unreasonable because the court did not adequately eliminate from the award the fees for activities unrelated to the litigation of the UTPCPL claim, resulting in an award of attorneys' fees for this single nonjury claim that was 128% of the verdict amount?

Appellants' brief at 4-5.

In their first issue on appeal, appellants argue that the trial court applied the wrong standard of proof to the plaintiffs' UTPCPL claim. According to appellants, the trial court should have used the clear and

convincing standard rather than the less stringent preponderance of the evidence standard. Appellants claim that since the jury had already issued a defense verdict on the plaintiffs' common law fraud claim using the clear and convincing standard, collateral estoppel barred relitigating the same issue.[4] Appellants argue that the clear and convincing standard applies to both common law fraud claims and fraud claims brought under the "catchall" provision of the UTPCPL. We disagree.

"In reviewing a decision of a court after a non-jury trial, we will reverse the trial court only if its findings are predicated on an error of law or are unsupported by competent evidence in the record." **Wallace v. Pastore**, 742 A.2d 1090, 1092 (Pa.Super. 1999), **appeal denied**, 764 A.2d 1071 (Pa. 2000), citing **Hodges v. Rodriguez**, 645 A.2d 1340 (Pa.Super.

---

[4] To determine whether collateral estoppel applies, we determine whether:

(1) An issue decided in a prior action is identical to one presented in a later action;

(2) The prior action resulted in a final judgment on the merits;

(3) The party against whom collateral estoppel is asserted was a party to the prior action, or is in privity with a party to the prior action; and

(4) The party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action.

**Murphy v. Duquesne University of Holy Ghost**, 745 A.2d 1228, 1235-1236 (Pa.Super. 1999), **affirmed**, 777 A.2d 418 (Pa. 2001), quoting **Rue v. K–Mart Corporation**, 713 A.2d 82, 84 (Pa. 1998).

1994). "The UTPCPL must be liberally construed to effect the law's purpose of protecting consumers from unfair or deceptive business practices." *Id.* at 1093 (citation omitted). "In addition, the remedies of the UTPCPL are not exclusive, but are in addition to other causes of action and remedies." *Id.* (citations omitted). "The UTPCPL's 'underlying foundation is fraud prevention.'" *Weinberg v. Sun Co., Inc.*, 777 A.2d 442, 446 (Pa. 2001), quoting *Commonwealth v. Monumental Properties, Inc.*, 329 A.2d 812, 816 (Pa. 1974).

> The UTPCPL provides a private right of action for anyone who "suffers any ascertainable loss of money or property" as a result of "an unlawful method, act or practice." Upon a finding of liability, the court has the discretion to award "up to three times the actual damages sustained" and provide any additional relief the court deems proper. Section 201-2(4) lists twenty enumerated practices which constitute actionable "unfair methods of competition" or "unfair or deceptive acts or practices." The UTPCPL also contains a catchall provision at 73 P.S. § 201-2(4)(xxi). The pre-1996 catchall provision prohibited "fraudulent conduct" that created a likelihood of confusion or misunderstanding. In 1996, the General Assembly amended the UTPCPL and revised Section 201-2(4)(xxi) to add "deceptive conduct" as a prohibited practice. The current catchall provision proscribes "fraudulent **or deceptive conduct** which creates a likelihood of confusion or of misunderstanding."

> [***Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC***, 40 A.3d 145, 151-152 (Pa.Super. 2012)] (internal citations omitted). ***See also Agliori v. Metropolitan Life Ins. Co.***, 879 A.2d 315, 318 (Pa.Super. 2005) (stating purpose of UTPCPL is to protect consumer public and eradicate unfair or deceptive business practices; foundation of UTPCPL is fraud prevention, and its policy is to place consumer and seller of goods and services on more equal terms; courts should construe its provisions liberally to serve remedial goals of statute).

***DeArmitt v. New York Life Ins. Co.***, 73 A.3d 578, 591-592 (Pa.Super. 2013) (emphasis in original).

"Nothing in the legislative history suggests that the legislature ever intended statutory language directed against consumer fraud to do away with the traditional common law elements of reliance and causation." ***Weinberg***, 777 A.2d at 446 (footnote omitted). ***See also Yocca v. Pittsburgh Steelers Sports, Inc.***, 854 A.2d 425, 438 (Pa. 2004) ("To bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance.") (citations omitted).

Because the transaction at issue here occurred before the 1996 amendments to the UTPCPL catchall provision permitting a claim for deceptive conduct, the plaintiffs had to establish the elements of common law fraud. To establish a claim for common law fraud, the elements must be proven by clear and convincing evidence. ***See Weissberger v. Myers***, 90 A.3d 730, 735 (Pa.Super. 2014), citing ***Pittsburgh Nat. Bank v.***

*Larson*, 507 A.2d 867, 869 (Pa.Super. 1986) ("stating that a party proving fraud must meet the more exacting standard of clear and convincing evidence, which is a higher standard of persuasion than mere preponderance of the evidence").[5]

As stated in *Sutliff v. Sutliff*, 543 A.2d 534, 538 (Pa. 1988), in the predominant number of civil cases, where only economic and property interests are at stake, the evidentiary burden requires only proof by a preponderance of the evidence. Section 201-9.2 of the UTPCPL, providing for private actions, does not set forth which standard of proof applies, and apparently the matter has never been decided by the Pennsylvania appellate courts. There is no language anywhere in the UTPCPL suggesting that private actions brought pursuant to Section 201-9.2 should be governed by a more demanding standard of proof than proof by a preponderance of the evidence. Moreover, the preponderance of the evidence standard of proof, which is the standard usually applied to remedial legislation, is consistent with the UTPCPL's purpose of protecting the public from fraud and unfair or deceptive business practices. *See Com. ex rel. Corbett v. Peoples Benefit Services, Inc.*, 923 A.2d 1230, 1236 (Pa.Cmwlth. 2007) ("we are cognizant of our supreme court's directive that the UTPCPL is to be

---

[5] Appellees argue that the post-1996 amended version of Section 201-2(4)(xxi) should apply because they instituted suit after it took effect. However, it was never disputed in the trial court that appellees had to prove all the elements of common law fraud. (*See* plaintiffs' proposed findings of fact and conclusions of law, 7/12/13 at 12 ¶ 14; RR at 1431.)

construed liberally to effectuate its objective of protecting consumers of this Commonwealth from fraud and unfair or deceptive business practices."), citing **Monumental Properties**, **supra**.

While not binding on this court, we find the Honorable R. Stanton Wettick, Jr.'s opinion on this issue in the case of **Eck v. Metropolitan Life Ins. Co.**, 2006 WL 6346564 (Allegheny Co. 2006), to be persuasive.[6] Therein, Judge Wettick notes that the UTPCPL is one of many laws protecting consumers which permit private actions, including the Real Estate Seller Disclosure Law, the Goods and Services Installment Sales Act, and the Credit Services Act. **Id.** at 18-20.

> There is no case law which suggests that the Legislature intended for private actions, brought pursuant to any of these other laws protecting consumers, to be governed by more demanding proof than a preponderance of the evidence. I have not been offered any reason why the Legislature would have intended for only Consumer Protection Law claims to be governed by a higher standard.

**Id.** at 20 (footnote omitted).

As in **Eck**, **supra**, appellants argue that the standard of clear and convincing evidence applies to any claims based on fraud. (**See** appellants' brief at 22 ("A clear and convincing evidence burden of proof must apply to Plaintiffs' UTPCPL claim because the clear and convincing evidence burden is

---

[6] "We recognize that decisions of the Court of Common Pleas are not binding precedent; however, they may be considered for their persuasive authority." **Fazio**, 62 A.3d at 411, quoting **Hirsch v. EPL Techs., Inc.**, 910 A.2d 84, 89 n.6 (Pa.Super. 2006).

a fundamental part of a fraud claim. 'When an allegation of fraud is injected in a case, the whole tone and tenor of the matter changes.'"), quoting **B.O. v. C.O.**, 590 A.2d 313, 315 (Pa.Super. 1991).) Judge Wettick rejected this position:

> I next consider the contention that a standard of clear and convincing evidence should be applied whenever a court characterizes a claim as fraud-based. As I previously discussed, there is no language in the Consumer Protection Law, in other consumer protection acts, in any legislative history, or in any Pennsylvania appellate court case law which supports this construction of the Consumer Protection Law. While judicially created tort law may, in setting a standard of proof, distinguish between fraud-based claims and other claims, this is not a distinction that legislators are likely to make. Consequently, a court should not assume that the Legislature intended to make such a distinction where there is no language in the legislation suggesting such a distinction.
>
> I believe that if the Consumer Protection Law did not include the catchall provision, courts, without discussion, would be applying a preponderance of the evidence standard to all private actions. A claim that the Legislature, by including the catchall provision, intended to change the burden of proof for all fraud-related conduct gives undue weight to the catchall provision. There appear to be few instances in which conduct coming within the catchall provision would not also come within one or more of the unfair practices described in §201-2(4)(i)-(xx). Thus, the tail would be wagging the dog if a fraud standard of proof governed all unfair trade practices because of the presence of the catchall provision.

**Id.** at 22-23. Judge Wettick's reasoning is sound in this regard and we adopt it as our own.

Finally, Judge Wettick notes that his ruling that private actions based on consumer protection legislation should be governed by a preponderance of the evidence standard of proof is consistent with appellate court case law in other jurisdictions, and with federal law. *Id.* at 23-24, citing, *e.g.*, *Cuculich v. Thomson Consumer Electronics, Inc.*, 739 N.E.2d 934 (Ill.App.Ct. 2000) (the plaintiffs were required to prove a claim under the Consumer Fraud Act only by a preponderance of the evidence; the Consumer Fraud Act does not specifically require a greater standard of proof and the Act is intended to provide broader protection to consumers than common law fraud claims); *Federal Trade Commission v. Tashman*, 318 F.3d 1273, 1280 (11th Cir. 2003) (applying a preponderance of the evidence standard for claims brought under the Federal Trade Commission Act). *See Com. Acting by Kane v. Flick*, 382 A.2d 762, 765 (Pa.Cmwlth. 1978) (the Federal Trade Commission Act and the Lanham Trademark Act were the models for Pennsylvania's UTPCPL and, hence, we may confidently look to decisions under those acts for guidance in interpreting the Pennsylvania Act) (citation omitted).

Therefore, we determine that the trial court correctly applied a preponderance of the evidence standard of proof to the plaintiffs' UTPCPL claims. As such, collateral estoppel did not apply and the trial court was not bound by the jury's previous finding, using a heightened standard, that the defendants did not engage in fraudulent conduct.

Next, appellants argue that the plaintiffs failed to prove all the elements of common law fraud, including a fraudulent misrepresentation and justifiable reliance. Appellants argue that even if Mr. Day told the plaintiffs that a $50 per month premium would guarantee a death benefit of $100,000, the document signed by Mr. Boehm, which he admittedly did not read, specifically provided that the value of the policy could differ based on the rate of return and charges. The document provided an illustration showing the policy with no value at age 50 based on a zero percent investment return, and guaranteed charges. (Appellants' brief at 27.)

As stated above, the pre-amendment version of Section 201-2(4)(xxi) applies here; therefore, the plaintiffs had to make out all the elements of common law fraud.

> In turn, to establish common law fraud, a plaintiff must prove: (1) misrepresentation of a material fact; (2) scienter; (3) intention by the declarant to induce action; (4) justifiable reliance by the party defrauded upon the misrepresentation; and (5) damage to the party defrauded as a proximate result.

*Ross v. Foremost Ins. Co.*, 998 A.2d 648, 654 (Pa.Super. 2010), quoting *Colaizzi v. Beck*, 895 A.2d 36, 39 (Pa.Super. 2006). *Cf. Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC*, *supra* (After the 1996 amendment, catchall provision liability can arise when the plaintiff alleges either fraudulent or deceptive conduct; the 1996 amendment permits

plaintiffs to proceed without satisfying all of the elements of common law fraud).

> In the non-commercial life insurance context, the customer is not required to scrutinize the policy to see if it matches the insurance agent's representations and meets the insured's expectations. [**Drelles v. Manufacturers Life Ins. Co.**, 881 A.2d 822, 835 (Pa.Super. 2005)]. "This Court has held that an insurance agent's expertise in the field of life insurance vests his . . . representations with authority and tends 'to induce the insured to believe that reading the policy would be superfluous.'" **Id.** at 836.

>> Moreover, "normal" contract principles do not apply to insurance transactions. Life insurance policies are contracts of adhesion and the adhesionary nature of life insurance documents is such that a non-commercial insured is under no duty to read the policy as issued and sent by the insurance company. Courts must be alert to the fact that the expectations of the buying public are in large measure created by the insurance industry itself. **Tonkovic v. State Farm** [**Mut. Auto. Ins. Co.**], 513 Pa. 445, 456, 521 A.2d 920, 926 (1987).

>>> Through the use of lengthy, complex, and cumbersomely written applications, conditional receipts, riders, and policies, to name just a few, the insurance industry forces the insurance consumer to rely upon the oral representations of the insurance agent. Such representations may or may not accurately reflect the contents of the written document and therefore the insurer is often in a position

- 25 -

> to reap the benefit of the insured's lack of understanding of the transaction.

> *Id.* In particular, the life insurance industry, despite repeated cautions from the courts, has persisted in using language which is obscure to a layman and, in tolerating agency practices, calculated to lead a layman to believe he has coverage beyond that which may be called for by a literal reading of the policy. Regardless of the ambiguity, or lack thereof, inherent to a given set of insurance documents (whether they be applications, conditional receipts, riders, policies, or whatever), courts must examine the dynamics of the insurance transaction itself to ascertain the reasonable expectations of the consumer.

*Id.* at 836–37 (some internal citations and one footnote omitted). Where nothing in the record supports the notion that the purchaser is an expert concerning the financial or insurance industry or the vocabulary used in that industry, he cannot be expected to use terms of art with the same understanding as a financial or insurance expert or even a lawyer might. *Id.* at 839. Thus, justifiable reliance often involves credibility determinations which are likewise for the fact-finder to resolve. *Id.*

> In view of the trust placed in insurance agents, it is not unreasonable for consumers to rely upon the representations of the expert rather than on the contents of the insurance policy itself, or to pass when the time comes to read the policy. Ultimately, policyholders have no duty to read the policy and are entitled to rely upon agent's representations unless the circumstances

> of the case make it "unreasonable" for
> them not to read the policy.
>
> > *Id.* at 840-41. Finally, the issue of justifiable reliance in this context also requires the fact-finder to consider "the relationship of the parties involved and the nature of the transaction" to determine whether the purchasers justifiably relied upon the agent's representations to the extent necessary to support their UTPCPL claims. *Id.* at 841. For these reasons at least, justifiable reliance is typically a question of fact for a fact-finder to decide. [*Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186, 208 (Pa. 2007)].

*DeArmitt*, 73 A.3d at 592-593.

Thus, in *Toy*, the plaintiff, Georgina Toy ("Toy"), alleged that one of Metropolitan Life's sales representatives, Bob Martini ("Martini"), presented Toy with information regarding a "50/50 Savings Plan." *Toy*, 928 A.2d at 189. Martini described the plan as a savings vehicle and stated that if Toy were to make monthly payments of $50, the plan would generate a fund of approximately $100,000 by the time she reached 65 years of age. *Id.* Toy was also informed that life insurance was part of the plan. *Id.* Toy completed the application and received a policy of insurance from Metropolitan Life, including a cover sheet describing the policy as, *inter alia*, a "Whole Life Policy," and "Life insurance payable when the insured dies." *Id.* By her own admission, Toy did not read the policy. Later, she filed suit alleging that the defendants misrepresented the policy as a savings or investment vehicle, leading her to believe she was investing in a savings plan when she was actually purchasing life insurance. *Id.* at

190. Toy brought claims under the UTPCPL including for fraudulent conduct under the catchall provision. *Id.* at 191.

On appeal, the defendants argued that Toy was precluded as a matter of law from pointing to Martini's alleged misrepresentations about the policy to establish justifiable reliance because those misrepresentations were rebutted by the terms of a clearly written and fully integrated contract. *Id.* at 203. The defendants also argued that a plaintiff in Toy's position should be required to read the parties' written contract and an action under the UTPCPL does not lie for a party who neglects to do so, thereby failing to detect the differences between the writing and the alleged misrepresentations made about its contents. *Id.*

Our supreme court disagreed, holding that the parol evidence rule does not apply to allegations of fraud in the execution of a contract, as compared to fraud in the inducement:

> We then discussed the so-called exceptions to the rule, observing that parol evidence may be introduced to vary a writing meant to be the parties' entire contract, when a party avers that that [sic] the contract is ambiguous or that a term was omitted from the contract because of fraud, accident or mistake. With regard to the exception for fraud, we noted that this Court has restricted the exception to allegations of fraud in the execution of a contract, and has refused to apply the exception to allegations of fraud in the inducement of a contract. We stated that "while parol evidence may be introduced based on a party's claim that there was fraud in the execution of a contract, *i.e.*, that a term was fraudulently omitted from the contract, parol evidence may not be admitted based on a claim that

>there was fraud in the inducement of the contract, *i.e.*, that an opposing party made false representations that induced the complaining party to agree to the contract."

*Id.* at 204-205, quoting *Yocca*, 854 A.2d at 437 n.26 (citations omitted). "This is so because in the fraud in the execution context, the allegation is that the written agreement *is not* the expression of the parties' true and complete contractual intent inasmuch as terms that were agreed to by the parties were omitted from that writing through fraud." *Id.* at 206 n.24. "[W]hen fraud in the execution is alleged, representations made prior to contract formation are not considered superseded and disclaimed by a fully integrated written agreement, as they are when fraud in the inducement is asserted." *Id.* at 206-207.

The court in *Toy* further concluded that the plaintiff could establish justifiable reliance on Martini's alleged misrepresentations even where she did not read the policy: "Some time ago, we determined that a party who engages in intentional fraud should be made to answer to the party he defrauded, even if the latter was less than diligent in protecting himself in the conduct of his affairs." *Id.* at 207 (citation omitted). Whether or not Martini's misrepresentations about the policy were obvious, given the

information on the policy's cover sheet, was a question of fact for the fact-finder to decide. *Id.* at 208.[7]

Instantly, at the meeting on January 29, 1996, Day recommended that the Boehms replace their 1986 universal life policy with a variable universal life insurance policy that would also provide $100,000 in coverage on Mr. Boehm and $100,000 in coverage on Mrs. Boehm. Mrs. Boehm testified that Day assured her that she would continue to be covered under the new policy through a spousal rider. Day also confirmed that premium payments would remain $50 per month. Day explained that they would be rolling over $5,400 from the old policy into the new 1996 VUL policy.

Despite Day's assurances, the first bill for the new VUL policy was for $150. When Mrs. Boehm called Day to ask whether there was a mistake, Day again assured her that the premium was $50 per month. Day stated that the bill for $150 was a mistake and he would take care of it. A new bill was sent for $50 and the Boehms continued to make monthly payments of $50 per month thereafter. However, unbeknownst to the Boehms, when the 1996 VUL policy was approved by the underwriting department at IDS Life, the premiums were tripled to $1,800 annually ($150/month). When the new

---

[7] Part II(C) of the late Chief Justice Cappy's Opinion, regarding justifiable reliance, was joined by Justices Eakin and Baer. Justices Baldwin and Newman did not participate in the decision of the case. Justice Saylor filed a concurring and dissenting Opinion, joined by Justice Castille, setting forth his disagreement that Toy's allegations fell outside the purview of the parol evidence rule. Justice Saylor would require something more than obvious misrepresentations concerning the terms of an integrated contract to maintain an exception to the parol evidence rule for fraud.

policy arrived in April 1996, the Boehms, not realizing any material changes had been made, did not read the policy. Instead, they relied on Day's representations that the annual premium remained $600 annually for $200,000 of coverage.

In September 2000, they received a letter from IDS Life informing them that they needed to increase their premium payments to $150 per month or they would lose their guaranteed death benefit. In fact, there was expert testimony that to fund the policy for its entire duration would require monthly payments of $240, far in excess of what Day had represented.

Based on these facts, the trial court concluded that Day had purposely and intentionally misrepresented the terms of the insurance policy. Day intentionally failed to explain to the Boehms that the premium amount had changed from $600 to $1,800 annually. Despite having been explicitly directed to do so by the insurer, Day failed to personally deliver the new policy to the Boehms and explain to them that the premiums had increased. Instead, when contacted by Mrs. Boehm about the discrepancy, Day characterized it as a "mistake." Although they admittedly failed to read the terms of the 1996 VUL policy, the Boehms justifiably relied on Day's misrepresentations as to the contents of the policy. The trial court, sitting as finder-of-fact in this matter, found the Boehms to be credible. Appellants argue that the policy contained illustrations demonstrating that at $50 per month, the policy would run out of money. However, since the plaintiffs are

alleging fraud in the execution of a life insurance contract, the parol evidence rule does not apply and they justifiably relied on Day's misrepresentations. *Toy*. We find the trial court's verdict was supported by the evidence. The plaintiffs established all the elements of common law fraud sufficient to make out a claim under the pre-amendment catchall provision of the UTPCPL.

Next, appellants argue the trial court erred in calculating statutory damages at $125,000. According to appellants, the proper measure of damages is the difference in value between what the plaintiffs bargained for and what they received; here, the value to the plaintiffs was a $100,000 death benefit if they paid $50 per month in premium payments plus their initial lump sum amount. (Appellants' brief at 35.) Appellants' expert on damages used a life expectancy for Mr. Boehm to age 85, or 2043. (*Id.* at 36.) Discounting to present value, appellants' expert subtracted the future premium payments from the $100,000 death benefit, to arrive at damages of $12,766. (*Id.*) Appellants argue that a present payment of $12,766 provides the plaintiffs with the benefit of their death benefit minus the premiums they expected to pay, discounted to present value, and places them in the same position they would otherwise have been in if the contract had been performed. (*Id.* at 36-37.) Appellants also argue that the trial court's damages award was speculative, not supported by the evidence presented by either party's experts, assumed without any evidence that

Mr. Boehm will live to age 95, which is ten years beyond his reasonable life expectancy, and fails to account for policy values based on future investment returns and insurance charges.

Appellees argue that the trial court properly applied this court's decision in *Lesoon v. Metropolitan Life Ins. Co.*, 898 A.2d 620 (Pa.Super. 2006), *appeal denied*, 912 A.2d 1293 (Pa. 2006), in arriving at its damages award. According to appellees, under *Lesoon*, they should be compensated for the difference in price between the policy that was promised and the policy that was issued. Instantly, the underfunded policy sold to appellees matures at age 95 and was promised to cost $50 per month, or $600 annually, plus an initial dump-in of $5,400 from the 1986 UL policy. The 1996 VUL policy provided $100,000 in death benefits to both Mr. and Mrs. Boehm for a total of $200,000 in coverage. It was alleged that the actual amount necessary to fully fund the policy at guaranteed rates was $240 per month, a difference of $190 per month, or $2,280 per year. Appellees multiplied $2,280 per year by 62 years (the number of years to maturity of the policy) to arrive at damages of $141,360. Appellees then subtracted the up-front payment of $5,400 for a total damage amount of $135,960. Appellees argue that this formula conforms with *Lesoon* and provides the amount of money necessary for the Boehms to be able to keep the policy in force for the duration of the term of the policy in order to honor

the bargain. Appellees argue that under Pennsylvania law, it is improper to

apply a discount rate to future lump-sum damages awards.

> The duty of assessing damages is for the fact-finder, whose decision should not be disturbed on appeal unless the record clearly shows that the amount awarded was the result of caprice, partiality, prejudice, corruption, or some other improper influence. **Skurnowicz v. Lucci**, 798 A.2d 788, 795 (Pa.Super.2002). "In reviewing the award of damages, the appellate courts should give deference to the decisions of the trier of fact who is usually in a superior position to appraise and weigh the evidence." **Ferrer v. Trustees of the University of Pennsylvania**, 573 Pa. 310, 343, 825 A.2d 591, 611 (2002) (quoting **Delahanty v. First Pennsylvania Bank**, 318 Pa.Super. 90, 464 A.2d 1243, 1257 (1983)). The damage calculation need not be determined with complete accuracy, but it must be founded on a reasonable factual basis, not conjecture. **Skurnowicz**, **supra**.

**Lesoon**, 898 A.2d at 628.

> To recover damages under the UTPCPL, a plaintiff must demonstrate an "ascertainable loss **as a result of** the defendant's prohibited action." **Weinberg v. Sun Co., Inc.**, 565 Pa. 612, 618, 777 A.2d 442, 446 (2001) (emphasis in original).

>> The determination of damages is a factual question to be decided by the fact-finder. The fact-finder must assess the testimony, by weighing the evidence and determining its credibility, and by accepting or rejecting the estimates of the damages given by the witnesses. Although the fact[-]finder may not render a verdict based on sheer conjecture or guesswork, it may use a measure of speculation in estimating damages. The fact-finder may make a just and reasonable estimate of the

damage based on relevant data, and in such circumstances may act on probable, inferential, as well as direct and positive proof.

***Penn Elec. Supply Co., Inc. v. Billows Elec. Supply Co., Inc.***, 364 Pa.Super. 544, 528 A.2d 643, 644 (1987) (internal citations omitted).

The provision governing damages in private actions under the UTPCPL, in pertinent part, states:

### § 201–9.2 Private Actions

(a) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any **ascertainable loss** of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover **actual damages** or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the **actual damages** sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.

73 P.S. § 201-9.2(a) (footnote omitted) (emphasis added). "The UTPCPL does not provide a formula for calculation of 'actual damages.'" ***Agliori***, ***supra*** at 319. Nevertheless, case law makes clear "that the UTPCPL was meant to supplement—not replace—common law remedies." ***Id.*** Under circumstances

> where the entire transaction was based on misrepresentations as to its true cost, an assessment of ascertainable loss cannot be made simply by examining what was purchased. *Id.* at 321. "Ascertainable loss must be established from the factual circumstances surrounding each case. . . ." *Id. See*, *e.g.*, *Lesoon v. Metropolitan Life Ins. Co.*, 898 A.2d 620, 633 (Pa.Super.2006), *appeal denied*, 590 Pa. 678, 912 A.2d 1293 (2006) (stating plaintiff should be compensated, at minimum, for difference in value between what he bargained for and what he received). Thus, ascertainable losses can include costs and other shortfalls associated with the transaction at issue. *Id.* at 632; *Agliori*, *supra*.

> When calculating a damages award under the UTPCPL:

>> Decisions by our Supreme Court and this Court have stressed time and again the deterrence function of the statute. If the court permits the appellee-defendants simply to repay what is owed the consumer under the fraudulently induced contract, the deterrence value of the [UTPCPL] is weakened, if not lost entirely. We cannot accept such an evisceration of the statutory goals.

> *Id.* at 321–22 (internal citations omitted).

*DeArmitt*, 73 A.3d at 593-594.

In *Lesoon*, the plaintiffs had two policies with MetLife providing $15,000 in coverage. *Lesoon*, 898 A.2d at 622-623. In January 1989, MetLife agent Ronald Sabilla advised Mr. Lesoon that he could increase his coverage to $65,000 by purchasing a $50,000 universal life policy for an additional cost of only $18 per month. *Id.* at 623. Plaintiffs agreed, and the application was approved; however, plaintiffs made it clear that they would

not agree to automatic withdrawal of the monthly premiums from their checking account, preferring instead to use payment coupons and checks as they had been since the 1970's. *Id.* Mr. Lesoon was told that the total monthly premium for all three policies would never exceed $50.50. *Id.* He was also told that the existing family and whole life policies would not be altered in any way. *Id.*

The plaintiffs later discovered that MetLife had enrolled them in the automatic withdrawal plan without their knowledge or consent. In fact, someone from MetLife had forged Ms. Lesoon's signature on a form authorizing monthly withdrawals from her checking account in the amount of $61.75. *Id.* at 623-624. The plaintiffs only became aware that this was occurring when they bounced two checks. *Id.* at 624.

Subsequently, the plaintiffs learned that their $5,000 age 65 family policy had been replaced with a $5,000 age 85 policy. *Id.* They also learned that premiums in the amount of $50.50 per month would not pay for the three policies unless money was transferred from the $5,000 policy to the new $50,000 policy. *Id.* In December 1989, the plaintiffs asked that everything be restored to where it was before they purchased the $50,000 policy. *Id.* Eventually, in June 1990, MetLife agreed to cancel the $50,000 universal life policy, refund all money in that policy to the plaintiffs, and issue a new $5,000 policy with the same monthly premium and the same terms as the initial policy. *Id.* MetLife had already refunded the

money which was taken out of Ms. Lesoon's checking account without her permission. *Id.*

The trial court found in favor of the plaintiffs on their UTPCPL and fraud claims, and awarded the minimum $100 in damages. *Id.* at 625. The trial court reasoned that the plaintiffs did not suffer actual damages where MetLife restored them to the position they would have been in had they not purchased the $50,000 policy. Although MetLife had withdrawn $185.25 from Ms. Lesoon's account without authorization, the money was returned and the bank waived its overdraft fees. *Id.* According to the trial court, the only possible damages were MetLife's fraudulent use of the plaintiffs' money ($185.25) for approximately four months, resulting in delay damages and statutory interest of $14.85. *Id.* at 625-626.

On appeal, the plaintiffs claimed they were entitled to restitution damages under the UTPCPL based on the fraudulent acts committed by MetLife and its agent, Sabilla. *Id.* at 628. The plaintiffs argued that the trial court erred in refusing to award restitution damages and in finding that rescission was the only available remedy:

> In the instant case, Appellants contend that the verdict is inconsistent with the underlying purpose of the UTPCPL, *i.e.*, fraud prevention, because the trial court merely returned the parties to the status quo that existed before any fraudulent acts were committed. Citing [*Metz v. Quaker Highlands, Inc.*, 714 A.2d 447 (Pa.Super. 1998)], and *Agliori*, *supra*, Appellants argue that MetLife should be required to compensate them for the value of the $50,000 policy that was promised to them by

> Mr. Sabilla. More succinctly, Appellants assert that they are entitled to recover the total amount it would have cost to fund the universal policy that they agreed to purchase from Mr. Sabilla because it was a bargained-for exchange, and Mr. Lesoon's assent was procured by fraud. According to Appellants, the trial court's failure to award restitution or "benefit-of-the-bargain" damages in this instance was contrary to the spirit of the UTPCPL and the holding in **Metz** and **Agliori**.

*Id.* at 629.

This court agreed, stating,

> [T]he testimony presented during the trial unequivocally established that Appellants failed to receive the benefit of the contract that Mr. Lesoon signed, and Appellants could not afford the policy that they actually received. Therefore, at a minimum, Appellants should be compensated for the difference in price between the policy that was promised to them and the policy that was issued.

*Id.* at 633. The **Lesoon** court also noted MetLife's deplorable conduct in that case, including the fact that the plaintiffs were initially told the unauthorized withdrawals were the result of human or computer error, and had to make repeated demands to inspect the withdrawal authorization form. *Id.* at 632. In January 1990, they asked MetLife to rescind the universal policy and restore the $5,000 family policy to its original state; MetLife did not comply with this request until June 1990. *Id.*

**Metz** and **Agliori** are also instructive. In **Metz**, the plaintiffs contracted with the defendant to buy land on which to build a home. **Metz**, 714 A.2d at 448. They soon discovered that the defendant had concealed

the fact that the lot was located on fill, which would increase the plaintiffs' construction costs. *Id.* at 449. In addition to rescission of the sales contract, the trial court awarded treble damages and attorneys' fees pursuant to the UTPCPL. The trial court reasoned that the plaintiffs were entitled to restitution to return them to their previous position. *Id.* On appeal, this court upheld the award of treble damages, noting that the defendant's refusal to resolve the matter when the defect was first discovered forced the plaintiffs to bring suit, and adopting the reasoning of the trial court that the measure of damages included the plaintiffs' costs of building a comparable house on a comparable lot, not located over fill, including transactional costs and any increase in interest rates. The *Metz* court stated, "In light of such outrageous conduct, to allow the rescission merely of the sales agreement without imposing a corresponding penalty for fraudulent behavior in consumer-type cases would do violence to the intent and purpose of the law (UTPCPL) enacted specifically by the Legislature to curb and discourage such future behavior." *Id.* at 450.

In *Agliori*, the plaintiff, James Donahue, surrendered three whole life insurance policies in exchange for a new universal life policy with a $40,000 death benefit. He subsequently discovered the terms of the universal life policy were different than he had been led to believe by the defendant-insurer, and brought suit seeking damages for fraudulent misrepresentation. Mr. Donahue died approximately 12 years after purchasing the universal life

policy and the executrix of his estate was substituted as the plaintiff. After a non-jury trial, the trial court determined that the insurer had engaged in deceptive acts in violation of the UTPCPL; however, the court found that Mr. Donahue suffered no ascertainable loss where the insurer paid his estate $40,000 plus interest upon his death. Therefore, Mr. Donahue had received the benefit of his bargain and there were no actual damages. On appeal, this court disagreed that Mr. Donahue had suffered no harm from the insurer's fraudulent conduct. First, we noted that the UTPCPL's provisions are to be construed liberally, consistent with its purpose of preventing and deterring fraud. *Agliori*, 879 A.2d at 320 (citations omitted). In choosing to exchange his three existing whole life policies for the universal life policy, Mr. Donahue was relying on the fraudulent misrepresentations of the insurance agent, George Weber:

> The transaction that Mr. Donahue entered was based on fraud and false information. The trial court found that agent Weber contacted Mr. Donahue about increasing his life insurance coverage and then gave him false information, with the result that Mr. Donahue cancelled his existing policies and purchased a new one. The trial court determined that Mr. Donahue relied on Mr. Weber's misrepresentations in making his decision to change his life insurance coverage. Mr. Donahue did not knowingly balance the positive and negative aspects of the proposed new policy with his existing life insurance coverage because of the misrepresentations made by Mr. Weber. Under such circumstances, an assessment of ascertainable loss, as required by section 9.2(a) of the statute, can not be made by examining only the terms of the new policy. It is not sufficient to ask only if Mr. Donahue

> received what he sought in the transaction, because the whole transaction was based on misrepresentation-and therefore he did not know the true cost to him and what he was potentially losing upon entry into the transaction proposed by Mr. Weber.

*Id.* at 320-321. Furthermore, this court found that the plaintiff's evidence suggested the estate would have received a greater benefit if Mr. Donahue had never entered into the transaction. *Id.* at 321. This is because although the $40,000 death benefit provided by the universal life policy exceeded the death benefit of the three surrendered whole life policies, Mr. Donahue lived for approximately 12 more years while the three surrendered policies would have increased in value, exceeding $40,000 by the time of his death. *Id.* The surrendered policies increased in value over time due to reinvestment of the dividends toward the purchase of additional coverage. *Id.* The **Agliori** court rejected the trial court's determination that Mr. Donahue did not suffer an ascertainable loss because his estate received the benefits of the universal life policy that he wished to purchase: "Ascertainable loss must be established from the factual circumstances surrounding each case, and in Mr. Donahue's case the evidence presented indicates that his estate suffered an ascertainable loss due to misrepresentations by Mr. Weber that induced Mr. Donahue to change his life insurance policy." *Id.* This court also reiterated the purposes of the UTPCPL, which is deterrence of fraudulent behavior: "If the court permits the appellee-defendants simply to repay what is owed the consumer under

the fraudulently induced contract, the deterrence value of the statute is weakened, if not lost entirely. We cannot accept such an evisceration of the statutory goals." *Id.* at 322.

The trial court did not err in applying *Lesoon* to the instant case. The correct measure of damages is the amount necessary to place the insureds in the position they would have been in if the bargain had been honored, *i.e.*, $200,000 total coverage at $50 per month plus an initial dump-in of $5,400. There was testimony that despite Day's promises, the actual amount necessary to fully fund the policy at guaranteed rates is $240 per month, not $50 per month. Appellants complain that the trial court failed to account for investment returns. (Appellants' brief at 39.) However, as appellees point out, the policy was purchased for the death benefit, not for its investment potential, and future investment returns are speculative. (Appellees' brief at 32.)

Appellants also argue that the trial court's damages award of $125,000 did not comport with the findings of either party's experts. However, the trial court was not bound to accept either party's damages calculations and could make its own reasonable estimate of damages based on the evidence. *DeArmitt*, *supra*. Here, the trial court explicitly found that appellants' experts on damages did not offer credible testimony. (Trial court opinion, 2/24/14 at 2.) We agree with the trial court that the analysis in *Lesoon*, as well as *Agliori*, provides the proper framework for assessing damages and

the trial court's damages award of $125,000 is approximately $10,000 less than requested by the plaintiffs. We also note that Day's conduct in this case was fairly outrageous, intentionally misrepresenting the actual premiums needed to fully fund the new policy. As stated above, the purpose of the UTPCPL is to punish and deter such misconduct. We find no abuse of discretion in the trial court's damages calculation.

Next, in a related issue pertaining to damages, appellants claim the trial court should have discounted the amount awarded to present value. Appellants argue that the total offset method does not apply where inflation has no impact on the amount of future premium payments as calculated by the plaintiffs' own expert. Appellants state that the plaintiffs' expert assumed the plaintiffs would need to make premium payments of $2,281 per year in excess of what they had expected to pay each year ($600), and these premium payments would remain the same every year regardless of inflation. Therefore, appellants argue, the line of cases applying a total offset method to loss of future earnings does not apply here.

> In 1916, the United States Supreme Court held that, when damages are based upon the deprivation of future pecuniary benefits, any lump-sum award should be discounted to the "present value" of those benefits. **Chesapeake & Ohio Railway Co. v. Kelly**, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117 (1916). Implicit in this holding was the Court's assumption that any monetary award would be safely invested by the awardee, and accordingly would earn interest for the duration of the award. Relying on the principle that damages should be limited to **compensating** the injured party for the

> deprivation of future benefits, the High Court determined that "adequate allowance [must] be made, according to circumstances, for the earning power of money." ***Id.*** at 491, 36 S.Ct. 630. If the earning power of the monetary damage award were not taken into account, then the true value of the award would be greater than the amount to which the aggrieved party was entitled, resulting in over compensation. ***Id.*** at 489, 493, 36 S.Ct. 630. Although finding it "self[-]evident that a given sum of money in hand is worth more than the like sum of money payable in the future," the Court declined to set forth a formula that should be used to calculate the discount of a damages award to present value. ***Id.*** at 489, 36 S.Ct. 630. Rather, the Court left such matters to "the law of the forum." ***Id.*** at 490-91, 36 S.Ct. 630.

***Helpin v. Trustees of the Univ. of Pennsylvania***, 10 A.3d 267, 270-271 (Pa. 2010) (emphasis in original).

In ***Kaczkowski v. Bolubasz***, 421 A.2d 1027 (Pa. 1980), our supreme court adopted the "total offset method," whereby the rate of interest and rate of inflation essentially cancel each other out. "Under the total offset method, a court does not discount the award to its present value but assumes that the effect of the future inflation rate will completely offset the interest rate, thereby eliminating any need to discount the award to its present value." ***Id.*** at 1036.

> In support of our adoption of the "total offset method" in allowing for the inflationary factor, we note that it is no longer legitimate to assume the availability of future interest rates by discounting to present value without also assuming the necessary concomitant of future inflation. We recognize that inflation has been and probably always will be an inherent part of our economy.

*Id.* at 1037. "[C]ritics of the total offset approach fail to realize that future inflation rates and future interest rates do not exist in a vacuum, but co-vary significantly. It can be stated with assurance that present interest rates depend at least in part upon expectations of future inflation." *Id.* (citations omitted).[8]

The ***Kaczkowski*** court also noted the efficiencies inherent in the total offset method:

> As to the concomitant goals of efficiency and predictability, the desirability of the total offset method is obvious. There is no method that can assure absolute accuracy. An additional feature of the total offset method is that where there is a variance, it will be in favor of the innocent victim and not the tortfeasor who caused the loss.

*Id.* at 1038.

> An additional virtue of the total offset method is its contribution to judicial efficiency. Litigators are freed from introducing and verifying complex economic data. Judge and juries are not burdened with complicated, time consuming economic testimony. Finally, by eliminating the variables of inflation and future interest rates from the damage calculation, the ultimate award is more predictable.

*Id.* ***See also Helpin***, ***supra*** (applying the total offset approach to lost future earned income partially derived from business profits).

---

[8] Indeed, this court may take judicial notice of the fact that currently, both interest rates and the inflation rate are at historic lows.

Appellants are correct that both *Helpin* and *Kaczkowski* applied the total offset method to lump-sum damages awards for lost future earnings. However, we disagree with appellants' characterization of the total offset approach as a "narrow exception" to the general rule that future damages need to be discounted to present value in order to avoid overcompensating the plaintiff. (Appellants' brief at 41.) As the court in *Helpin* remarked, "*Kaczkowski*'s central assumptions--that inflation must be considered and that, over time, inflation rate totally offsets interest rate--are not dependent on the individual facts surrounding any specific lump-sum future damages award." *Helpin*, 10 A.3d at 276. In addition, although both *Helpin* and *Kaczkowski* involved lost future income, we see no reason why the total offset approach is inappropriate here, particularly given the remedial purpose of the UTPCPL. Appellants have cited no case where damages for a claim of fraudulent misrepresentation in connection with the sale of a life insurance policy under the UTPCPL were discounted to present value. The loss of the promised death benefit due to appellants' fraudulent misconduct is a present loss, not a future loss. (Appellees' brief at 35.) The trial court did not err in refusing to apply a discount rate to reduce the damages award in this case.

Finally, appellants contest the trial court's award of attorneys' fees. As stated above, the trial court awarded approximately $165,000 in attorneys' fees, together with costs of over $5,000. Appellants argue that 1) the trial

court failed to eliminate hours spent on non-UTPCPL claims, including claims related to the 1986 policy and time spent preparing for the jury trial on the common law fraud claim; 2) the case was not complex and the plaintiffs' lead attorney has over 30 years trying similar cases, making the award unreasonable; 3) plaintiffs' counsel's hourly rates were unreasonable and not consistent with Pittsburgh rates and those of similar cities; and 4) the trial court's award of attorneys' fees was not commensurate with the underlying damages award and resulted in a windfall to plaintiffs' counsel.

We review for an abuse of discretion. *Neal v. Bavarian Motors, Inc.*, 882 A.2d 1022, 1029 (Pa.Super. 2005), *appeal denied*, 907 A.2d 1103 (Pa. 2006), citing *Skurnowicz v. Lucci*, 798 A.2d 788, 796 (Pa.Super. 2002).

> The law relevant to determining attorney fees under the UTPCPL was well stated by our esteemed colleague Judge Joseph A. Hudock in *Sewak v. Lockhart*, 699 A.2d 755 (Pa.Super.1997):
>
> > In a case involving a lawsuit which include[s] claims under the UTPCPL . . . the following factors should be considered when assessing the reasonableness of counsel fees:
> >
> > > (1) The time and labor required, the novelty and difficulty of the questions involved and the skill requisite properly to conduct the case; (2) The customary charges of the members of the bar for similar services; (3) The amount involved in the controversy and the benefits

> resulting to the clients from the services; and (4) The contingency or certainty of the compensation.
>
> ***Id.*** at 762, citing ***Croft v. P. & W. Foreign Car Service***, 383 Pa.Super. 435, 557 A.2d 18, 20 (1989).

***Id.*** at 1030-1031 (footnote omitted).

> (1) there should be "a sense of proportionality between an award of damages [under the UTPCPL] and an award of attorney's fees," and (2) whether plaintiff has pursued other theories of recovery in addition to a UTPCPL claim "should [be] given consideration" in arriving at an appropriate award of fees.

***Id.*** at 1031, quoting ***McCauslin v. Reliance Finance Co.***, 751 A.2d 683, 685-686 (Pa.Super. 2000).

> The Court in ***McCauslin*** did not mandate a proportion that would be the limit of acceptability, but only suggested that there be a "sense of proportionality" between the two amounts. Nor would it have been appropriate for this Court to fix a proportionate amount that would define the limit of recoverable fees, since the General Assembly specifically chose ***not*** to include such a factor in the statute.

***Id.*** (footnote omitted) (emphasis in original).

Appellants assert that the trial court failed to eliminate time spent litigating non-UTPCPL claims. However, a review of the plaintiffs' fee petition indicates that they did attempt to remove all non-UTPCPL time as required by ***Neal***. Obviously, in a case such as this, where the plaintiffs are proceeding on multiple theories of relief, including under the UTPCPL, it is

difficult to parse out the time between the UTPCPL claim and other causes of action. The parties went to a jury trial on the common law fraud claim before proceeding to a bench trial on the UTPCPL claim. Much of the time spent in pre-trial litigation would relate to both UTPCPL and common law causes of action. *See Northeast Women's Center v. McMonagle*, 889 F.2d 466, 476 (3rd Cir. 1989) ("In cases in which the plaintiff's successful and unsuccessful claims involve a common core of facts or related legal theories, or where much of counsel's time is dedicated to the litigation as a whole, it is often impossible to divide counsel's time on a precise claim-by-claim basis." (citations omitted)).

Second, appellants argue that this case was not particularly complex and that plaintiffs' counsel has 30 years of experience trying similar actions against life insurance companies, alleging improper sales practices under the UTPCPL. Appellants argue that the only question was whether the defendants misrepresented the premium payments necessary to fully fund the 1996 policy. We disagree with appellants' characterization of the case as simple. As appellees point out, this matter involved the sale of a variable universal life policy, which is more complex than a whole life policy and requires both an insurance license and a securities license to sell. (Appellees' brief at 40.) This matter involved highly technical issues requiring expert testimony. (*Id.* at 41.) There were over 100 exhibits, 52 of which were admitted. (*Id.* at 39.) The trial court found the attorneys'

fees were reasonable based on the amount of work done and the skill and experience of the attorneys involved. (Trial court opinion, 2/24/14 at 3.)

Third, appellants complain that the hourly rates used to calculate the award of counsel fees were unreasonable. According to appellants, plaintiffs' counsel relied on rates charged in cities such as Philadelphia and Washington, D.C., instead of cities comparable to Pittsburgh such as Cleveland or Cincinnati. (Appellants' brief at 49.) Plaintiffs' counsel used a rate of $400 for Kenneth Behrend, Esq., and $275 for his associate. (*Id.*) Appellants claim that the average hourly rate for an experienced attorney in Ohio is only $247. (*Id.* at 50.)

Appellees point out that appellants do not support their claim that the hourly fee should be reduced to $247 with affidavits. (Appellees' brief at 42.) The trial court considered the survey data, including current affidavits from other plaintiff's counsel in the Pittsburgh area, and concluded that the fees were customary and justified. (Trial court opinion, 2/24/14 at 3.) We also note that Mr. Behrend has been practicing law for over 30 years and has developed much of the law in the area of life insurance sales practices, successfully litigating numerous reported cases relied upon in this opinion including *Agliori*, *DeArmitt*, *Lesoon*, *Fazio*, and *Toy*. (Plaintiffs' fee petition, 9/18/13 at 2-3 (RR at 3032-3033).) We will not disturb the trial court's discretion in this regard.

Finally, appellants argue that the trial court's award of attorneys' fees was well in excess of the underlying damages award and represented a windfall or "bonanza" to plaintiffs' counsel where they had a contingency fee arrangement. (Appellants' brief at 50.) Although the fee award exceeded the damages award, we do not find it to be disproportionate under the facts of this case. As the trial court stated, "the benefits provided to the Plaintiffs by the attorneys were extremely significant, not only based on the amount of the verdict, but also based on the nature of the claim (*i.e.* lost life insurance coverage due to unfair trade practices)." (Trial court opinion, 2/24/14 at 3.) In **Neal**, **supra**, this court found a multiple of 11.5 of UTPCPL damages to the attorney fee award was not disproportionate. **Neal**, 882 A.2d at 1031 n.8. In addition, we note that the fee-shifting statutory provision of the UTPCPL is designed to promote its purpose of punishing and deterring unfair and deceptive business practices and to encourage experienced attorneys to litigate such cases, even where recovery is uncertain. **See Krebs v. United Refining Co. of Pennsylvania**, 893 A.2d 776, 788 (Pa.Super. 2006) ("these cases hold generally that where the General Assembly has departed from the "American Rule" (where each party is responsible for his or her own attorneys' fees and costs), by providing a fee-shifting remedy in a remedial statute, the trial court's discretionary award or denial of attorneys' fees must be made in a manner consistent with

the aims and purposes of that statute."), citing **Krassnoski v. Rosey**, 684 A.2d 635, 637-638 (Pa.Super. 1996).

Regarding the plaintiffs' contingency fee arrangement, the trial court observed that counsel agreed to take the case with no guarantee of payment. (Trial court opinion, 2/24/14 at 3.) In addition, a contingency fee agreement is just one of many factors to consider in arriving at an award of a reasonable attorneys' fee. **Krebs**, 893 A.2d at 791 ("it would be inappropriate to apply a contingency fee agreement to create a ceiling (or for that matter, a closed door) on the recovery of attorneys' fees under a fee-shifting provision of a remedial statute."). For these reasons, we determine the trial court did not abuse its discretion in calculating the award of attorneys' fees.

Judgment affirmed.

Musmanno, J. joins the Opinion.

Shogan, J. files a Concurring and Dissenting Opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/19/2015

- 53 -